STATE of Minnesota, Respondent,

v.

Tony James LAHUE, Appellant.

No. CX–97–1360.

Supreme Court of Minnesota.

Oct. 29, 1998.

---

9. *State v. Williams*, 535 N.W.2d 277, 286 (Minn. 1995).

10. *Id.*

11. *State v. Camacho*, 561 N.W.2d 160, 169 (Minn.1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).

John M. Stuart, State Public Defender, Lyonel Norris, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Gayle C. Hendley, Asst. County Atty., Minneapolis, for respondent.

OPINION

LANCASTER, Justice.

After a jury trial in Hennepin County District Court, appellant, Tony James Lahue, was convicted of one count of murder in the first degree, Minn.Stat. § 609.185(1), and one count each of the lesser included offenses of murder in the second degree, Minn.Stat. § 609.19, subd. 1(1), and Minn.Stat. § 609.19, subd. 2(1). Appellant argues that the circumstantial evidence presented at trial was insufficient to prove that he committed the murder of the victim, Kirby Boeck. Appellant's pro se supplemental brief also alleges that he received ineffective assistance of counsel at trial. We affirm.

The body of Kirby Boeck was found in his Minneapolis apartment on May 24, 1996. An autopsy determined that Boeck's death resulted from 30 or more blows to the head with a blunt object. A Hennepin County medical examiner testified at trial that all of these wounds occurred near the time of death, and that Boeck had died two to three days to a week before his body was discovered.

Boeck was last seen alive on May 18, 1996. Boeck's parents and friends tried repeatedly to telephone him in the days prior to the discovery of his body, only to hear a continuous busy signal. A former girlfriend of Boeck testified that she made the first in a series of such unsuccessful calls at around 1:30 to 2 p.m. on the afternoon of May 18.

Appellant was an acquaintance and former roommate of Boeck. At approximately 10 or 11 a.m. on the morning of May 18, 1996, appellant and his friend Janel Jensen encountered Boeck outside a restaurant in the Uptown area of Minneapolis. At the suggestion of Boeck, the three walked to Boeck's nearby apartment, where they drank alcohol and listened to music.

Jensen testified that approximately one-half hour to 45 minutes after entering the apartment, she went to use the bathroom. Upon returning from the bathroom, she amused herself by petting Boeck's cat. It was not until the cat scratched her that Jensen looked up and saw Boeck and the appellant standing in the living room and witnessed the appellant striking Boeck. She saw "kind of a lot" of blood on the victim's head and on the carpet.

Jensen was not sure if she witnessed the first blow that appellant landed on the victim, and she might have seen the victim fall. She did not see the appellant holding a weapon in his hand, but testified that he must have been holding one in light of Boeck's extensive bleeding. Jensen did not remember observing much more of the incident. Not only was she drunk at this point, but also shocked by the sudden and apparently unprovoked attack. Jensen immediately grabbed her school bag and fled the apartment. She ran to a grassy mall near Lake Street where she told some friends what she had seen. No one called the police, apparently because it did not occur to them that anyone might be in mortal danger.

A day or two later, appellant and Jensen had a very limited discussion about the incident. Appellant told Jensen that "he was sorry [she] had to see that" and that it would not have happened if he had not been drunk. Jensen did not know at the time that anyone had died, and did not discuss the incident further with the appellant.

In the days following the incident, appellant's friends saw him with a variety of items that belonged to the victim. Most notably, appellant was seen possessing well over 100 of Boeck's compact discs. Jensen testified she told appellant "I'm not going to ask where they came from," to which he responded "good." Another friend of the appellant, Seth Burke, testified that he helped appellant remove stickers from the discs that had the name "Kirby" on them. Burke asked about the origin of the discs, and appellant said, "don't worry about it." Appellant and Burke later sold the discs at some area stores which deal in the buying and selling of used records. Appellant then cut up and disposed of the backpack and duffel bag in which he had been carrying the compact discs.

Appellant was also seen during this time with a .357 magnum. A gun case for a .357 magnum was found by police in Boeck's

apartment. Appellant told his friends that there was "a long story" behind the gun.

After May 18 appellant was no longer in possession of a pager belonging to his girlfriend, Toni Forbragd, that he typically carried. Appellant told Forbragd that he had lost the pager. Police investigators found this blood-stained pager caught underneath the box spring of the bed in the victim's apartment on which Boeck's body was found.

Appellant was arrested on May 27, 1996, at around 2:30 a.m., after being located in a crawl space underneath the staircase of an apartment building in south Minneapolis. Appellant was found with a single pair of shoes. DNA testing indicated that blood found on appellant's left shoe was that of the victim. Appellant's right shoe was shown to have made a bloody shoe print that was found on a TV Guide magazine lying on the floor of the victim's bedroom. The tread from the appellant's shoes corresponded with other bloody shoeprints found at the victim's apartment.

The victim's body was discovered on May 24, 1996, by his mother after she went to his apartment to check on him. Finding the door to her son's apartment unlocked, Betty Boeck proceeded inside. What she found was a ransacked apartment and a large blood stain on the living room floor. Fearing the worst, she then looked into her son's bedroom, and found his body lying on a blood-soaked bed.

Expert analysis of blood spatters found on the walls of the apartment indicated that the victim had been struck in at least four different sites in the living room, and then in at least two more places in the bedroom.

The presence of diluted blood in the bathroom indicated someone attempted to clean up following the attack. A palm print found on the side of the bathroom sink did not match that of the appellant; the victim's body was too decomposed to determine if this or any other fingerprint found at the scene was his.

A number of the victim's belongings, including some cymbals and martials arts weapons, were found by investigators on the floor of the living room. The presence of pools of blood under these items led a forensic scientist with the Bureau of Criminal Apprehension to testify that these items had been left on the floor after the attack. Latent fingerprints found on the cymbals did not correspond with those of the appellant.

A telephone cord that appeared to have been removed from the telephone in the victim's bedroom was also found on the living room floor. The absence of blood on top of the cord, and the blood found beneath it, suggested the cord had been placed there after the blood was already on the floor.

Additionally, a couple of cigarette butts were found in the apartment. An examination of the cigarette butts found that they contained DNA material from two individuals. DNA testing did not rule out the possibility that the DNA found on them could have come from the victim and the appellant.

At least two items were found to be missing from the victim's martial arts collection, including a baton and a long sword. The medical examiner who performed the autopsy on the victim testified that the blunt-force trauma that killed the victim "could have easily" been caused by a martial arts baton such as the one missing from the victim's apartment.

When we review a claim by an appellant that the evidence was insufficient to support a conviction, we are limited to determining whether a jury could reasonably conclude that the defendant was guilty of the charged offense. See State v. Atkins, 543 N.W.2d 642, 646 (Minn.1996). We view the evidence in the light most favorable to the verdict when determining whether the jury gave due regard to the presumption of innocence and the state's burden to overcome it with proof beyond a reasonable doubt. See State v. Ostrem, 535 N.W.2d 916, 923 (Minn. 1995).

We have held that convictions based on circumstantial evidence will be upheld if a detailed review of the record indicates that the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any other rational hypothesis. See id. at 923. When reviewing the circumstantial evidence and the infer-

ences that may be derived from it, we recognize a jury is in the best position to evaluate the evidence. *See State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988).

■ Appellant's sole argument against the sufficiency of the evidence is that it does not exclude all other possibilities than his guilt. Appellant contends that the evidence does not exclude the possibility that after an altercation between himself and Boeck, appellant left Boeck's apartment, and someone else then entered the apartment and committed the murder. Under this scenario, appellant later returned to the apartment, found that Boeck had been murdered, and proceeded to steal the victim's possessions.

■ An alternative theory does not justify a new trial if that theory is not plausible or supported by the evidence. *See State v. Wallace,* 558 N.W.2d 469, 473 (Minn.1997); *State v. Steinbuch,* 514 N.W.2d 793, 800 (Minn.1994). Appellant does not point to any evidence in the record that might support his alternative scenario. We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture. *See Wallace,* 558 N.W.2d at 473.

In contrast, the state provided a large amount of circumstantial evidence linking the appellant to the murder. Jensen testified that she observed a very violent attack by the appellant on the victim; no evidence suggests that anyone saw the victim alive after that. The medical examiner testified that the nature of the victim's wounds led him to believe they were all received shortly before his death.

The victim's former girlfriend tried to call the victim only a couple of hours after Jensen approximated that this incident occurred, only to receive the same busy signal that she and the victim's family would continue to receive over the next several days. This supports the state's theory that the phone might have already been disabled, and the murder completed, at the time of her call.

Appellant was seen with property that appeared to have belonged to the victim. Appellant's demeanor and statements in the days following the incident at the victim's apartment suggested that the appellant had stolen items from the victim and that the details of this incident implicated him in serious criminal conduct.

Appellant's bloody shoe prints were found in the victim's apartment and traces of the victim's blood were found on the appellant's shoes. Finally, appellant's bloody pager was under the box spring of the bed on which Boeck's murdered body lay.

The evidence, viewed in the light most favorable to the verdict, clearly was sufficient to establish appellant's guilt beyond a reasonable doubt. We determine that a jury could reasonably conclude that appellant was guilty of the charged offense of first-degree murder.

■ In a pro se supplemental brief, appellant raises an additional argument that he was denied the effective assistance of counsel. This claim lacks merit.

Appellant alleges that his counsel did not adequately explore at trial the significance of the cigarette butts found at the crime scene, failed to adequately impeach the testimony of Jensen, failed to locate a possible defense witness named "Holly," and ineffectively presented the defense's theory of the case during his opening statement.

■ An appellant arguing that he or she received ineffective assistance of counsel must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors. *Scruggs v. State,* 484 N.W.2d 21, 25 (Minn.1992) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). An appellant claiming to have received the ineffective assistance of counsel bears the burden of proof on his or her claim. *State v. Heinkel,* 322 N.W.2d 322, 326 (Minn.1982).

■ A strong presumption exists that counsel's performance fell within a wide range of reasonable assistance. *See State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986). Particular deference is given to the decisions of counsel regarding trial strategy. "Which witnesses to call at trial and what information to present to the jury are questions that

lie within the proper discretion of the trial counsel." *Id.*

The examples appellant mentions in his supplemental brief involve disputes with the tactics employed by his attorney at trial. Even counsel's alleged failure to locate "Holly" constitutes a matter of trial strategy. *See id.* at 236 (holding defendant's contentions that his counsel failed to hire an investigator or interview prospective witnesses concerned matters of trial strategy).

■ Finally, even if there were errors in counsel's professional performance, the defendant must still show that he was prejudiced as a result. *See id.* at 236–37. Prejudice is determined by examining whether "under the totality of the circumstances, the result would have been different if counsel had not erred." *Id.* at 237. To prove that he or she was prejudiced by the failure of counsel to locate a possible witness, a defendant has an affirmative burden to show that the witness would have had an impact on the outcome. *See Gates v. State,* 398 N.W.2d 558, 562–63 (Minn.1987).

Appellant does not explain how any of the items he discusses would exonerate him. In contrast, several pieces of physical evidence tie the appellant to the murder. Appellant has not demonstrated either that his counsel's conduct fell below the range of acceptable performance, or that he was prejudiced as a result.

Affirmed.