**STATE of Minnesota, Respondent,**

v.

**Ronald E. CRAM, Appellant.**

**Nos. CX–02–1178, A05–1379.**

Supreme Court of Minnesota.

Aug. 3, 2006.

Lisa Lodin Peralta, Minneapolis, MN, Deborah Ellis, St. Paul, MN, for Appellant.

Mike Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Assistant County Attorney, St. Paul, MN, for Respondent.

## OPINION

GILDEA, Justice.

After a bench trial, Ronald Cram was found guilty of the first-degree murder of his wife, Colleen Cram, while committing domestic abuse. Cram was also found guilty of second-degree intentional murder, but not guilty of first-degree premeditated murder. The district court convicted Cram and sentenced him to life in prison. After Cram appealed his conviction to this court, we granted Cram's motion to stay the appeal during the pendency of postconviction proceedings. On May 13, 2005, the district court denied Cram's petition for postconviction relief. Cram then appealed the denial of postconviction relief to this court. We consolidated the direct appeal and the postconviction appeal. We now affirm Cram's conviction and the denial of postconviction relief.

Early in the morning on December 5, 2001, St. Paul police and paramedics responded to Cram's 911 call from his home, arriving within five minutes of the call. Cram told the 911 operator that he was arguing with his wife and then she stopped breathing. The paramedics found Colleen Cram on the floor unconscious, ashen, and with marks on her body. She was not breathing, had no heartbeat, and had multiple bruises from the tips of her fingers to her head, back, abdomen, legs, and feet. Cram, who was agitated, very wet with perspiration, and pacing, told a member of the Rescue Squad something like "I did it this time." Asked by a paramedic how his wife got the marks on her body, Cram said, "I beat her up, I hit her."

When the police arrived, Cram told Officer Matthew Arntzen, "She has been f* * *ing with my mind for years and now I have hurt her." Cram told Arntzen that he had been married to the victim for 26 years. When Arntzen asked what happened, Cram said that "he had been arguing with his wife all night." Cram asked Arntzen, "Be straight with me, Officer, I am going away for a long time, aren't I?" Cram then said, "I really hurt her this time."

Following Cram's arrest, St. Paul Police Sergeant Investigator Bruce Wynkoop interviewed him at police headquarters. Audiotapes and a transcription of the interview were entered into evidence at trial. Wynkoop told Cram that Colleen Cram had died and showed Cram pictures of her taken at the hospital after her death. Cram told Wynkoop that they started fighting at about "6:00 o'clock last night." Cram said that his wife had asked Cram to hit her and he said, "It took her twelve f* * *in' hours last night before I hit her." Shortly afterward, Cram said, "it took her twelve hours to get me mad, damn mad." Cram said that he did not hit his wife until

about 5 a.m. that morning, when he took a stick and "hit her in the butt ten, fifteen times." Cram said, "She told me to hit her with it and she'll answer." In Cram's words, "Finally, I got to where I swatted the shit out of her with [the stick] a couple of times." When asked why he hit his wife with the stick, Cram said, "Cause she demand I did it" and "She told me she'd answer me."

When Wynkoop asked if he felt "bad about what happened," Cram replied, "I'm not crazy." Cram then said, "I do know it was a bad f* * *in' thing when somebody dies" and "I'm not going to act like I'm nuts and not know the difference." When asked, "Why do you say 'most likely I did [hit her with my hands],' " Cram replied, "Cause I have before." Upon being confronted with evidence, Cram also admitted that he hit his wife with an electrical cord on the morning of the murder. According to Cram, his wife

> went and got [the cord] for me after the stick was broke. * * * Not only did I hit her with the damn electrical cord, * * * when she was telling me that she's not right and, and falling down, I hit her with it again, telling her it's bulls* *t, quit your f* * *in' lying. * * * I hit her with the [doubled up] cord. Probably ten times telling her to get up.

Finally, Cram admitted that he hit his wife "[e]verywhere," using an open hand and his fists, and that he had "hit her in the past." Asked if he remembered hitting his wife with his hands more than ten times on the morning of the murder, Cram replied, "Yeah." Wynkoop then asked Cram, "When you were hitting her in the front of the body, ah, that wasn't cause she was demanding that you hit her or punish her, am I right there?" Cram replied, "No she wasn't. No, that was, just, that was just

being in my face over and over and over and over again."

Cram was subsequently indicted, and he waived his right to a jury trial. The case was tried to the court.

At trial, the state called Dr. Michael McGee, the Ramsey County Medical Examiner, to testify regarding the cause of death of Colleen Cram. Dr. McGee testified that he performed the autopsy and that the victim had soft tissue injuries on virtually every part of her body. The injuries were too numerous to count. She had oval bruising on both shoulders and left arm, small focal bruises on the left breast, scattered bruises on the knees, shins and thighs, loop-shaped injuries (consistent with an electrical cord) on the lower abdomen and thigh, and several injuries consistent with being hit by a tire iron that was found under the cushions of a sofa at the scene. Internally, Colleen Cram had rib fractures, bruising on both lungs, deep soft tissue injury in her back and buttocks to the point of liquefying the fatty tissue, and severe internal trauma with extensive lacerations in the abdominal cavity. She had a fresh fracture to her left arm's ulna that Dr. McGee attributed to a blow she received while attempting to defend herself from a tire iron, and another defensive injury in her palm consistent with a tire iron blow. Finally, the victim also had a healing fracture to the left leg below the knee from an injury that occurred weeks to months earlier.

Dr. McGee testified that the internal injuries suffered by Colleen Cram, deep within the body, are most commonly seen in motor vehicle accidents where the victim was not restrained. Dr. McGee testified that the internal injuries were also consistent with a significant force such as kicking or stomping. Dr. McGee's opinion was that the cause of Colleen Cram's death was "multiple traumatic injuries due to an as-

sault" that led to her internally bleeding to death. Dr. McGee believed that "the injuries would take a substantial amount of time to deliver" and that it would have taken a minimum of one hour to inflict such injuries.

With regard to the past pattern of domestic abuse, an element of first-degree domestic abuse murder, the state called 16 witnesses. These witnesses testified that they had previously seen Colleen Cram, over a period spanning nearly her entire marriage, exhibit signs that she had been a victim of domestic abuse at the hands of Cram. The witnesses included Colleen's mother, cousin, brother (T.C.), coworkers at four of her places of employment, an ophthalmologist, two neighbors, and two police officers. One of Colleen's work managers, her mother, and her cousin, among others, testified that Colleen had told them that Cram hit her. An officer testified that in March 2001, after Colleen's coworkers alerted police to potential abuse, Cram told police that he had hit his wife. Finally, a neighbor testified that less than a month before the murder, she heard Cram, as he came out of his house, "loudly and very angrily" say " 'This has been happening for over two years, I should just kill you and collect the insurance money.' "

Cram testified in his defense at trial. He stated that he and his wife had three arguments between 6 p.m. on December 4 and 6 a.m. on December 5, 2001. According to Cram, the first argument was verbal. During the second argument, his wife started "hollering" and hitting Cram, and Cram believed that he hit her back. Cram testified that during the third argument, his wife "would come and hit me with things that I would take away from her." He said that his wife first hit him with a tire iron in the head, and he took it away from her and hit her "once or twice" on the bottom with it. He stated that he hit his wife with the tire iron because he "believed that would calm her down." He testified that he "must have snapped" and "must have been in a rage," and that this third argument was different because "it seemed like there was just no end to the aggravating things she would say to me."

After five days of testimony, the trial concluded, and the court took the matter under advisement. The court subsequently issued written findings of fact. The court found Cram not guilty of premeditated first-degree murder, guilty of first-degree domestic abuse murder, and guilty of second-degree intentional murder. Cram was sentenced to life in prison. This consolidated appeal followed.

Cram raises three issues. First, Cram claims that he was denied his right to present a complete defense because of three separate erroneous evidentiary rulings. Second, Cram claims that his trial counsel was ineffective in failing to challenge the restitution award. Third, Cram argues that the postconviction court abused its discretion in denying, without an evidentiary hearing, his petition for postconviction relief on the basis of ineffective assistance of trial counsel. We turn to an analysis of these issues.

I.

■ Cram argues that his right to present a complete defense was violated when the district court restricted his cross-examination of two state witnesses, and when the court granted the state's motion to preclude Cram from calling a priest, with whom Cram and his wife had met, to testify as a witness. We accord deference "to the trial court's exercise of discretion in evidentiary matters and will not lightly overturn a trial court's evidentiary ruling." *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). Absent a clear

abuse of discretion, an evidentiary ruling will not be reversed. *State v. Grayson,* 546 N.W.2d 731, 736 (Minn.1996). "If exclusion of the evidence did violate defendant's constitutional right to present a defense, the decision will not be reversed if it is found to be harmless beyond a reasonable doubt." *Kelly,* 435 N.W.2d at 813. Any error in the exclusion of evidence is harmless " 'if the verdict actually rendered was surely unattributable to the error.' " *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (quoting *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996)).[1]

*Cross–Examination of Two State Witnesses.* Cram claims the district court erred when it did not allow Cram to cross-examine Colleen Cram's brother, T.C., about the brother's alleged abuse of his sister. Cram also claims that the district court erred when it did not allow Cram to cross-examine his wife's former coworker, K.W., about K.W.'s alleged sexual advances toward Cram and his wife. The state called T.C. and K.W., and both testified that Colleen Cram told them her husband had been abusing her. The state offered this evidence in connection with the element of domestic abuse murder requiring a past pattern of abuse. Cram argues that preventing the cross-examination of these witnesses violated his constitutional right to confront the witnesses to show bias and his right to present a full defense. Specifically, Cram argues that the evidence he sought to elicit on cross-examination would have "corroborate[d]

Mr. Cram's defense theory that he acted in the heat of passion and was not acting with extreme indifference to human life."

▉▉▉ We turn first to Cram's argument that the cross-examination was relevant to show bias. Regarding T.C., we conclude that the district court did not err in precluding the cross-examination of T.C. about his alleged abuse of the victim. Cram alleged that T.C. abused his sister approximately 35 years before the murder. The district court precluded the cross-examination of T.C. on the basis of spousal privilege. We conclude that the district court erred in precluding this examination on the basis of spousal privilege.[2] But, the testimony Cram sought to elicit from T.C. was plainly not relevant to the issue of T.C.'s supposed bias. Whether the victim said that her brother touched her inappropriately 35 years before the murder has no bearing on T.C.'s credibility, and the evidence was therefore properly excluded as irrelevant. *See State v. Lanz–Terry,* 535 N.W.2d 635, 640 (Minn.1995) ("[N]ot everything tends to show bias, and courts may exclude evidence that is only marginally useful for this purpose.").

▉▉▉ Regarding K.W., Cram argues that K.W. was biased against him because he rebuffed her sexual proposition. Cram contends his and his wife's rejection of K.W. gave K.W. a motive to fabricate her testimony about Cram's past abuse of his wife, and that he should have been allowed to explore this bias on cross-examination. Even assuming arguendo that it was error

---

1. We assume without deciding that Cram has alleged constitutional errors. Therefore, we apply the more stringent "surely unattributable" standard to the alleged errors. In contrast to this standard, for errors that do not rise to the constitutional level we examine whether "there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Stewart,* 643 N.W.2d 281, 298 (Minn.2002).

2. Cram alleged that his wife told him her brother had abused her. Because the foundation for the cross-examination of T.C. was based on a spousal communication, the district court ruled it inadmissible under spousal privilege. This ruling was erroneous because spousal privilege "does not apply * * * to a criminal action or proceeding for a crime committed by one against the other." Minn. Stat. § 595.02, subd. 1(a) (2004).

to limit Cram's cross-examination of K.W. as to bias, we hold that any error was harmless beyond a reasonable doubt.

Assuming Cram had established that K.W.'s bias motivated her to fabricate her testimony about Cram's prior abuse of Colleen Cram, K.W. was only one of sixteen witnesses who testified about Cram's abuse. *See Juarez*, 572 N.W.2d at 291 (noting that "[t]he overwhelming evidence of guilt is a factor, often a very important one, in determining whether, beyond a reasonable doubt, the error has no impact on the verdict."). Contrary to Cram's assertion at oral argument, K.W.'s testimony was not "critical" or "key" to the state's proof of past pattern. Four other witnesses testified, including a coworker of both K.W. and Colleen Cram, that Colleen Cram had told them that Cram had previously abused her. Two additional witnesses testified to witnessing Cram commit domestic abuse on separate occasions. Nine other witnesses testified to incidents from which a fact finder could reasonably infer that Colleen Cram had been abused by Cram. Finally, Cram himself admitted to police that he beat his wife prior to the night of the murder. We conclude that the district court's finding that Cram committed prior abuse was surely unattributable to K.W.'s testimony. Accordingly, we hold that any error in not allowing Cram to cross-examine K.W. about her alleged bias was harmless beyond a reasonable doubt.

■ Cram's alternative argument is that the evidence he sought to elicit on cross-examination of T.C. and K.W. was relevant to corroborate his heat of passion defense. Other than the bare assertion, Cram offers no explanation, and we cannot discern on this record, how testimony from T.C. about T.C.'s alleged abuse of Colleen Cram some 35 years earlier or K.W.'s testimony about a rejected proposition would have bolstered Cram's argument that he acted in the heat of passion on the night he murdered his wife. We hold that the district court did not abuse its discretion in precluding this cross-examination.

■ *Priest as Defense Witness.* Cram next argues that the district court erred when it prevented Cram from calling as a defense witness a priest who had once met with Cram and his wife for counseling. Cram alleges that Colleen told the priest that a coworker of Colleen's "had made a lesbian advance towards her." The district court granted the state's motion that the priest be precluded from testifying on the basis of the priest-penitent privilege under Minn.Stat. § 595.02, subd. 1(c) (2004).[3] Cram argues that he "was prejudiced by not being able to present the testimony of [the priest] because [the priest] was an objective, credible witness that could lend credence to Mr. Cram's later testimony of the emotional issues with which Mrs. Cram struggled, including on the night before she died." Cram contends that the priest's testimony would have undermined the state's proof on the

3. Minnesota Statutes § 595.02, subd. 1(c) reads:

A member of the clergy or other minister of any religion shall not, without the consent of the party making the confession, be allowed to disclose a confession made to the member of the clergy or other minister in a professional character, in the course of discipline enjoined by the rules or practice of the religious body to which the member of

the clergy or other minister belongs; nor shall a member of the clergy or other minister of any religion be examined as to any communication made to the member of the clergy or other minister by any person seeking religious or spiritual advice, aid, or comfort or advice given thereon in the course of the member of the clergy's or other minister's professional character, without the consent of the person.

element of domestic abuse murder requiring that Cram acted with "extreme indifference to human life." Minn.Stat. § 609.185(a)(6) (2004). We conclude that there was no error in excluding this testimony.

The priest-penitent privilege, by the terms of the statute, covers the conversation at issue, and Cram makes no claim to the contrary. Cram is correct to note that we have recognized that privileges " 'sometimes must give way to the defendant's right to confront his accusers.' " *State v. Reese,* 692 N.W.2d 736, 742 (Minn.2005) (quoting *State v. Kutchara,* 350 N.W.2d 924, 926 (Minn.1984)). In this case, however, Cram provides no sound basis for this court to override the statutory privilege. Cram does not explain, and we cannot discern on this record, how the priest's testimony about one conversation the priest had with the murder victim nine months before the murder would have been relevant to the domestic abuse murder charge. We hold that the district court did not err in precluding the priest's testimony.

## II.

■ In addition to the evidentiary errors discussed above, Cram also argues ineffective assistance of trial counsel in his direct appeal. Specifically, Cram argues that he received ineffective assistance when his trial counsel failed to challenge the restitution award against Cram. On September 23, 2002, the district court ordered that Cram pay restitution to T.C. in the amount of $21,031.29,[4] to the victim's mother in the amount of $548.00, and to the Minnesota Crime Victim's Reparations Board, for funeral expenses, in the amount

of $6,276.30. Cram argues that his trial counsel's "complete failure to challenge the state's request for restitution" amounts to "per se prejudice."

■ Generally, to prove ineffective assistance of counsel, a defendant has the burden of proving both prongs of the two-prong test articulated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). Under the first prong, an appellant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. Under the second prong, an appellant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is " 'a probability sufficient to undermine confidence in the outcome.' " *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Cram implicitly argues that he does not have to satisfy the second, "prejudice" prong of the *Strickland* test, citing *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic,* the Supreme Court noted that it had "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." 466 U.S. at 659 n. 25, 104 S.Ct. 2039.

The record indicates that a restitution hearing was held on July 30, 2002, in which Cram's trial counsel persuaded the judge to hold the matter open. Additionally, the

---

4. Nearly all of T.C.'s award was related to costs incurred by the victim's estate, including over $16,000 of incurred legal fees for probate, and for the victim's medical treatment on the day of her death. The restitution was awarded to T.C. in his role as personal representative of the estate.

restitution order indicates that Cram had 30 days after August 6, 2002 to contest the claims for restitution. Because the record does not support Cram's claim that his trial counsel was either totally absent or was prevented from assisting him in contesting restitution, we conclude that he must satisfy both prongs of the *Strickland* test in order to prove an ineffective assistance of counsel claim.[5]

Our conclusion that Cram must meet the second, prejudice prong of *Strickland* disposes of Cram's claim. There is nothing in the record to suggest that the restitution award was improper. *See* Minn.Stat. § 611A.04 (2004) (listing types of expenses that may be reimbursed by restitution). In order to dispute a restitution claim, Cram has to produce "a detailed sworn affidavit * * * setting forth all challenges to the restitution or items of restitution, and specifying all reasons justifying dollar amounts of restitution which differ from the amounts requested by the victim or victims." Minn.Stat. § 611A.045 subd. 3(a) (2004). Cram presented no evidence or even any argument that he had a basis to challenge the award. Without any evidence to show that there is a basis to challenge the award, Cram has not shown that he was prejudiced by his trial counsel's alleged ineffectiveness. *See Lahue*, 585 N.W.2d at 790. We hold that Cram's claim of ineffective assistance of trial counsel in challenging the restitution award fails.

### III.

■ Separate from the ineffective assistance of trial counsel claim made in his direct appeal as discussed *supra*, Cram argued in his petition for postconviction relief that his trial counsel was ineffective.

The postconviction court (which was also the trier of fact) denied the petition and Cram's request for an evidentiary hearing, concluding that based on the entire record, Cram had not alleged sufficient facts which, if proved, would entitle him to relief. Cram argues that the postconviction court erred in denying his petition without first holding a hearing. We will not reverse a postconviction court's decision absent an abuse of discretion. *Zenanko v. State*, 688 N.W.2d 861, 864 (Minn.2004).

■ Cram's postconviction claim is that his trial counsel was ineffective because his counsel conducted an "inadequate investigation [that] resulted in a failure to raise and present a viable mental illness defense and to present evidence in support of a [lesser included heat of passion] manslaughter conviction." The test for ineffective assistance of counsel is an objective one, and Cram bears the burden of proof on his claim. *Lahue*, 585 N.W.2d at 789. As discussed *supra*, we follow the two-prong test announced in *Strickland* in assessing claims of ineffective assistance of counsel. 466 U.S. at 687, 104 S.Ct. 2052. We have also recognized that "[t]here is a strong presumption that a counsel's performance falls within the wide range of 'reasonable professional assistance.'" *Jones*, 392 N.W.2d at 236.

■ A petition for postconviction relief must contain "a statement of the facts and the grounds upon which the petition is based and the relief desired." Minn.Stat. § 590.02, subd. 1(1) (2004). "A district court must grant an evidentiary hearing for any postconviction petition filed, unless the issues raised in the petition conclusively show that the petitioner is not entitled to relief." *Carney v. State*, 692 N.W.2d

---

**5.** Cram's appellate counsel appealed his conviction on July 18, 2002. Although Cram's trial counsel did appear at the restitution

hearing on July 30, 2002, neither the parties nor our review of the record indicate who was representing Cram after July 30, 2002.

888, 891 (Minn.2005). The record conclusively shows that Cram is not entitled to relief on his claim for ineffective assistance of counsel. Accordingly, we conclude that the postconviction court did not abuse its discretion in denying the petition without an evidentiary hearing.

In support of his claim of ineffective assistance of trial counsel, Cram provided three affidavits to the postconviction court. One affidavit was from trial counsel in which counsel reiterates his belief, as he previously told the district court, that his "heavy case load at the time" of Cram's trial put him "in a compromised position." The second affidavit, from attorney Joseph Friedberg, opined that trial counsel's performance was objectively unreasonable. Relying on these two affidavits, Cram argues his counsel was ineffective for failing to retain an expert on Chronic Fatigue Syndrome (CFS). The record, however, establishes that trial counsel originally *did* pursue the use of expert witness testimony on the issue of CFS. Counsel ultimately did not further pursue expert testimony, but not because of a lack of effort on his part. Rather, counsel apparently ended his efforts to obtain a CFS expert because the district court ruled that Cram would not be permitted to offer expert testimony regarding CFS. The court did not "believe an expert could testify any more cogently than [Cram] could as to whether or not he does suffer from [CFS] and what those symptoms are."[6] Accordingly, even if

Cram's counsel had retained an expert on CFS, as Friedberg opines he should have, this expert's testimony would not have been admissible under the district court's ruling.

The third affidavit Cram offered was from Dr. Lawson Bernstein, opining that, "within a reasonable degree of medical certainty * * * Cram suffered from long-standing organic solvent neurotoxicity." Dr. Bernstein also gave the opinion that Cram "suffered from an acute closed head injury" at the time of the murder, implying that it was caused by his wife striking Cram in the head with a tire iron.[7] Dr. Bernstein then alleged that either neurotoxicity or a closed head injury "can cause a person to lose the ability to appreciate the nature of an act." Based on an examination of Cram conducted over 15 months after the murder, his review of Cram's medical records, and his review of the record, Dr. Bernstein concluded that, at the time of his wife's death, "Cram suffered a defect of reason * * * [and] was unable to understand what he was doing and what the consequences of his actions would be."[8]

The issue regarding Dr. Bernstein's affidavit is not whether Cram in fact suffered from what Dr. Bernstein terms "neurotoxicity," or even whether "neurotoxicity" could be a mental illness under Minnesota law.[9] The issue is

---

6. Cram did not appeal this ruling.

7. The postconviction court concluded that "[t]here were no facts adduced at trial to support Dr. Bernstein's conclusion that [Cram] must have been hit in the head with a tire iron (the 'cause' of the [closed] head injury) before [Cram] killed his wife."

8. In addition to his opinion that counsel was ineffective for failing to retain an expert on CFS, Friedberg also concludes that Cram's

trial counsel was ineffective based on Dr. Bernstein's affidavit.

9. Cram is not arguing that Dr. Bernstein's affidavit satisfies the standard of newly discovered evidence warranting a new trial. It plainly does not. *See Sutherlin v. State*, 574 N.W.2d 428, 434 (Minn.1998) (discussing standard for evaluating newly discovered evidence within the context of postconviction relief). Dr. Bernstein's affidavit is apparently premised on one examination of Cram over a year after the murder and Cram's self-report-

whether Cram's trial counsel was objectively ineffective for not pursuing a mental illness defense. This record conclusively establishes that he was not.

Counsel examined medical records for his client dating back approximately ten years before the murder. These records contained psychiatric evaluations which diagnosed Cram as having depression and suggested that he had CFS. Although the evaluations indicate that Cram reported having memory loss problems, neither of them give any indication that he did not know the nature of his actions.[10]

Trial counsel also was faced with Cram's incriminating, voluntary, statements to police on the morning of the murder. In these statements, Cram admitted to hitting his wife "everywhere" with a stick, his hands, his fists, a doubled up electrical cord, and a tire iron. Cram also told police, "I'm not crazy." He then said, "I do know it was a bad f* * *in' thing when somebody dies" and "I'm not going to act like I'm nuts and not know the difference." A reasonable attorney would have considered this evidence very difficult, if not impossible, to overcome in attempting to establish a mental illness defense. As the postconviction court concluded, there was no "contemporaneous mental illness diagnosis or bizarre or psychotic behavior which could have been observed by [counsel] during his representation of [Cram.]" *See Davis v. State*, 595 N.W.2d 520, 527 (Minn.1999) (noting that "events surrounding the crime" are properly considered when making "determination about [the defendant's] sanity"). On this record, we hold that trial counsel was not objectively unreasonable for failing to pursue a mental illness defense.

 Finally, regarding Cram's claim that his trial counsel was ineffective for failing to present evidence to support his heat of passion theory, we first note that Cram's trial counsel did present evidence to support such a theory. Cram did not allege any facts to the postconviction court which, if true, would have supported his claim that counsel was objectively unreasonable for failing to present *more* evidence in support of his heat of passion manslaughter theory.[11] His argumenta-

ing of exposure to chemicals during employment in the printing industry that occurred between 10 and 30 years before the murder. Assuming this speculative theory was even admissible, *see Goeb v. Tharaldson*, 615 N.W.2d 800, 814–816 (Minn.2000) (discussing standard for admission of expert testimony), at best, this evidence is "doubtful," and as such, it would not warrant granting Cram relief under the newly discovered evidence standard. *See Sutherlin*, 574 N.W.2d at 434.

**10.** Cram relies on *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), to support his claim of ineffective assistance of counsel. Cram's reliance is misplaced because *Rompilla* is a death penalty case in which trial counsel failed to examine the prosecution's "own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize." *Id.* at ——, 125 S.Ct. at 2465. There are no such failures alleged here. Additionally, there is a clear difference in the failure to discover mitigating circumstances in the penalty phase of a death penalty trial and the alleged failure to pursue a mental illness defense. *Any* readily available, mitigating fact discovered in *Rompilla* may have changed the outcome of that case, *id.* at ——, 125 S.Ct. at 2468–69, but establishing that Cram had a viable mental illness defense is a much more difficult task. *See State v. Wilson*, 539 N.W.2d 241, 244 (Minn.1995) (requiring defendant to prove, by a preponderance of the evidence, "that he did not know the nature of his act or that it was wrong").

**11.** Although "heat of passion is not a mitigating circumstance" to the crime of first-degree domestic abuse murder (the crime for which

tive assertion to that effect is not enough to meet his burden of overcoming the "strong presumption that a counsel's performance falls within the wide range of 'reasonable professional assistance.' " [12] *Jones*, 392 N.W.2d at 236; *see also Sutherlin*, 574 N.W.2d at 436 (holding that because petitioner only made "argumentative assertions without factual support," he was not entitled to the requested relief and no hearing was required).

In sum, Cram did not raise facts in his petition for postconviction relief which, if true, would entitle him to relief. Accordingly, we hold that it was not an abuse of discretion for the postconviction court to deny his petition without a hearing.

. Affirmed.

the district court sentenced Cram), *State v. Bradford*, 618 N.W.2d 782, 801 (Minn.2000), it is a lesser included offense to second degree intentional murder (the other crime the district court found that Cram committed). *State v. Johnson*, 719 N.W.2d 619 at 626, 2006 WL 1770530 at *5 (Minn. June 29, 2006).

12. Cram also fails to allege what additional evidence his counsel could have presented to support his heat of passion manslaughter theory.