*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0693**

State of Minnesota,
Respondent,

vs.

Justin Thomas Keodouangdy,
Appellant.

**Filed April 1, 2024
Affirmed
Wheelock, Judge**

Jackson County District Court
File No. 32-CR-22-14

Keith Ellison, Attorney General, Lisa Lodin, Assistant Attorney General, St. Paul, Minnesota; and

Kristi Meyeraan, Jackson County Attorney, Jackson, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Richard Schmitz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Wheelock, Presiding Judge; Schmidt, Judge; and Reilly, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**NONPRECEDENTIAL OPINION**

**WHEELOCK**, Judge

Following a jury trial, appellant was convicted of unlawful possession of a firearm in violation of Minn. Stat. § 624.713, subd. 1(2) (2020). Appellant challenges his conviction on two grounds: (1) the district court erred by not suppressing evidence obtained through the search warrant because the search warrant was not supported by probable cause and (2) the circumstantial evidence was insufficient to prove that he constructively possessed the firearm. We affirm.

**FACTS**

On December 18, 2020, A.K., an investigator for Jackson County, applied for a search warrant to search a residence in the City of Jackson for evidence of possession or sale of narcotics by appellant Justin Thomas Keodouangdy. The residence was owned by M.S., and A.K. believed Keodouangdy had been residing there. A.K. provided the following information in the search-warrant application:

- In June 2020, Wyoming state law enforcement recovered 14.9 ounces of methamphetamine and 13.7 pounds of THC liquid from Keodouangdy's vehicle during a traffic stop.

- In September 2020, Martin County law enforcement recovered approximately one ounce of methamphetamine during the execution of a search warrant at "one of [Keodouangdy's] residences" in Dunnell.

- In early December 2020, an informant who was in custody at the Jackson County Jail told A.K. that a person named "JT," which are Keodouangdy's initials, was selling methamphetamine to another person known to the Jackson County Sheriff's Office to be a drug user or dealer. The

2

informant provided the name of the street in Jackson where "JT" resided.

- Another member of law enforcement told A.K. that Keodouangdy was residing at an address on the same street in Jackson that the informant identified.

- In December 2020, Freeborn County law enforcement recovered approximately three-quarters of a pound of methamphetamine during the execution of a search warrant in a vehicle that had been crashed and abandoned on Interstate 90. The Freeborn County officers also found documents with Keodouangdy's name on them inside the vehicle.

- In December 2020, a Jackson County deputy collected three bags of trash from outside the residence in Jackson. A.K. inspected the trash and found five plastic sandwich bags containing marijuana residue, one plastic Ziploc sandwich bag with a purple and green seal containing methamphetamine residue, and a bill addressed to M.S.

- A.K. reviewed photographs of evidence collected from the abandoned vehicle in Freeborn County and found that the Freeborn County officers had also recovered a Ziploc sandwich bag with a purple and green seal containing methamphetamine.

- In 2016, Keodouangdy was convicted of two controlled-substance-possession offenses, one first degree and one fifth degree.

- Keodouangdy recently had been released from his 115-month prison sentence for his 2016 conviction, and in A.K.'s training and experience, individuals who are recently released from incarceration tend to use multiple residences when they are unable to secure stable housing.

The district court granted the search warrant, and a team of officers that included A.K. and a second investigator, T.M., executed the warrant on December 21, 2020. When the officers knocked and announced their presence, M.S. answered, and officers escorted

him outside. T.M. then checked all of the rooms to see if anyone else was inside. The doorknob to the southeast bedroom was locked when T.M. first tried to enter, but T.M. pushed the door open without much force. Just inside the bedroom was a dresser with a flat-screen television facing away from the door, and beyond the dresser was a bed next to the wall. T.M. found Keodouangdy sleeping on top of the bed next to a laundry basket and other items. T.M. attempted to wake Keodouangdy, which took some time, and after Keodouangdy awoke, T.M. escorted him out of the residence.

After determining that no one else was inside the residence, T.M. took photographs to document the state of the residence before officers began the search. On the bed where Keodouangdy had been sleeping, T.M. found and photographed a cell phone and a wallet that contained Keodouangdy's driver's license, identification card, and bank card, and A.K. found a firearm with the serial number scrubbed off and ammunition in the magazine. On the dresser, T.M. found and photographed an "employment portfolio" with Keodouangdy's name on the cover and a piece of mail addressed to Keodouangdy and bearing an address for a different house in Jackson. Neither officer found items in the bedroom that appeared to belong to anyone except Keodouangdy.

Respondent State of Minnesota charged Keodouangdy with unlawful possession of a firearm in violation of Minn. Stat. § 624.713, subd. 1(2).

Keodouangdy requested a contested omnibus hearing to challenge probable cause as to his constructive possession of the firearm and as to "the execution of the search warrant," but he did not file a written motion explaining the grounds for his challenges. At the beginning of the contested omnibus hearing, Keodouangdy's attorney described the

4

two issues as follows: "One is probable cause of the warrant or the basis of the warrant and the second one is constructive possession of the gun in question." The state first called the officer who pulled the trash bags from M.S.'s residence. Keodouangdy's attorney did not question that officer. The state also called A.K., who testified about the search warrant and the search. Keodouangdy's attorney questioned A.K. about (1) finding the firearm on the bed, including how he found it, what else was on the bed, whether he moved the firearm before it was photographed, and whether he wore gloves; (2) whether the firearm or any other items were fingerprinted or DNA tested; (3) whether A.K. identified anything else found during the search of the residence as belonging to Keodouangdy rather than M.S.; (4) whether, on the date of the search, officers knew how long Keodouangdy had been staying at the residence; and (5) whether A.K. knew that the charges that arose out of the traffic stop in Wyoming had been dismissed sometime after A.K. executed the search warrant.

Keodouangdy did not present argument on his challenges at the hearing and instead submitted a written memorandum of law. Keodouangdy styled his motion as a motion to dismiss the charge and argued that the state lacked sufficient evidence to prove that he constructively possessed the firearm, but he did not challenge probable cause for the search warrant and did not argue that any evidence should be suppressed. The state's written response noted that Keodouangdy did not make any argument supporting his challenge to probable cause for the search warrant in his memorandum, and thus, the state did not make any responsive arguments about probable cause for the warrant, instead relying on the evidence submitted at the omnibus hearing.

5

The district court denied Keodouangdy's motion. The district court first determined that Keodouangdy's motion was "a motion to dismiss on the basis that (1) there was no probable cause for the search warrant and (2) there is no probable cause that Keodouangdy was in constructive possession of the pistol." The district court noted that "Keodouangdy did not specifically challenge anything in regard to the search warrant at the hearing nor did he challenge anything in his subsequent written closing argument." It then determined that probable cause existed for the warrant because the warrant application stated that officers found Ziploc bags containing marijuana and methamphetamine residue in the trash outside the residence, Keodouangdy had been staying at the residence, and Keodouangdy had recent connections with drug activity. It issued an order stating, "Keodouangdy's Motion to suppress all evidence obtained as a result of the search warrant is DENIED."

The case proceeded to a jury trial. The parties stipulated that Keodouangdy was ineligible to possess a firearm. Thus, the only issue for the jury was whether Keodouangdy constructively possessed the firearm. The jury found Keodouangdy guilty.

Keodouangdy appeals.

## DECISION

Keodouangdy argues first that, because the search warrant was not supported by probable cause, the evidence should have been suppressed and second that the evidence was insufficient to prove his constructive possession of the firearm. The state contends that Keodouangdy forfeited his argument for suppression of evidence by not making it to the district court and, alternatively, that probable cause for the search warrant exists under the totality of the circumstances. The state also argues that the evidence was sufficient to

support Keodouangdy's conviction under both the direct- and circumstantial-evidence standards of review. We address these arguments in turn.

## I. The district court did not err by not suppressing evidence because probable cause existed to support the search warrant.

Keodouangdy asserts that the district court erred by not suppressing evidence that officers discovered during the search of M.S.'s residence because the search warrant was invalid for lack of probable cause. He makes five arguments to dispute that probable cause existed for the search warrant: (1) the warrant application contained inadequate information to enable the district court to assess the credibility of the informant; (2) the results of the trash search did not provide a sufficient nexus between the alleged crime and the place to be searched; (3) the issuing judge should not have considered the evidence seized during the traffic stop in Wyoming because that evidence was suppressed in the Wyoming case; (4) the issuing judge should not have considered Keodouangdy's prior convictions because they were stale and attenuated; and (5) the information about the evidence seized by Freeborn County law enforcement was vague, uncertain, and unconnected to Keodouangdy dealing drugs out of M.S.'s residence in Jackson County. The state argues that Keodouangdy forfeited his challenge to probable cause by not raising these specific challenges to the district court and, alternatively, that the district court did not err by not suppressing the evidence because the search warrant was supported by probable cause under the totality of the circumstances.

We begin by addressing the state's forfeiture argument. A constitutional challenge to the admission of evidence is untimely if it is not raised at the omnibus hearing in a

7

pretrial motion to suppress. *State v. Pederson-Maxwell*, 619 N.W.2d 777, 780 (Minn. App. 2000). Minnesota Rule of Criminal Procedure 10.01, subdivision 2, states:

> Defenses, objections, issues, or requests that can be determined without trial on the merits must be made before trial by a motion to dismiss or to grant appropriate relief. The motion must include all defenses, objections, issues, and requests then available. Failure to include any of them in the motion constitutes waiver . . . .
>
> The court can grant relief from the waiver for good cause.

Minnesota Rule of Criminal Procedure 10.03, subdivision 1, states that "motions must be made in writing and served upon opposing counsel no later than three days before the Omnibus Hearing unless the court for good cause permits the motion to be made and served later." An untimely challenge is forfeited, and we will not consider it unless it would "perpetuate a substantial and essential injustice in the sense that . . . an innocent [person] may have been convicted." *State ex rel. Rasmussen v. Tahash*, 141 N.W.2d 3, 11 (Minn. 1965); *accord State v. Lieberg*, 553 N.W.2d 51, 56 (Minn. App. 1996).

Moreover, a motion to suppress "should specify, with as much particularity as is reasonable under the circumstances, the grounds advanced for suppression in order to give the state as much advance notice as possible as to the contentions it must be prepared to meet at the hearing." *State v. Needham*, 488 N.W.2d 294, 296 (Minn. 1992). In *Needham*, we recognized that in practice, the precise grounds for suppression are not always clear at the outset of the contested omnibus hearing but rather become clear during the questioning of the witnesses. *See id.* But if a defendant does not raise their precise challenges in a

8

motion to suppress or at the omnibus hearing and instead raises them for the first time on appeal, those precise arguments are forfeited. *See Lieberg*, 553 N.W.2d at 56.

Here, Keodouangdy challenged probable cause for the warrant generally but did not raise, at the omnibus hearing or in his written memorandum, any of the specific challenges to the information in the warrant application that he now raises on appeal. And the Wyoming traffic stop was the only information in the search-warrant application about which Keodouangdy questioned A.K. during the contested omnibus hearing—he did not question A.K. about the informant, Keodouangdy's prior convictions, the nexus established by the trash search, or the evidence Freeborn County law enforcement seized. We agree that Keodouangdy's failure to assert these challenges forfeited them.

But even if we concluded that Keodouangdy did not forfeit any of the particular grounds that he raises on appeal, we agree with the district court that the warrant was supported by probable cause.

The United States and Minnesota Constitutions provide that no warrant shall issue without a showing of probable cause. U.S. Const. amend. IV; Minn. Const. art. I, § 10; *see* Minn. Stat. § 626.08 (2020) ("A search warrant cannot be issued but upon probable cause . . . ."). When determining whether a search warrant is supported by probable cause, we give great deference to the issuing judge's determination of probable cause and do not conduct a de novo review. *State v. Holiday*, 749 N.W.2d 833, 839 (Minn. App. 2008). We limit our review "to ensuring that the issuing judge had a substantial basis for concluding that probable cause existed," applying a totality-of-the-circumstances test. *State v.*

9

*McGrath*, 706 N.W.2d 532, 539 (Minn. App. 2005), *rev. denied* (Minn. Feb. 22, 2006).

Under the totality-of-the-circumstances test,

> [t]he task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985). We review the components of a search-warrant affidavit in combination rather than in isolation, and "doubtful or marginal cases" are resolved in favor of the preference for search warrants. *Holiday*, 749 N.W.2d at 839-40 (quotation omitted). A search-warrant application is facially sufficient to support a finding of probable cause if it "suppl[ies] specific facts to establish a direct connection, or nexus, between the crime alleged and the place to be searched, particularly in cases involving the search of a residence for evidence of drug activity." *McGrath*, 706 N.W.2d at 539 (quotation omitted).

Here, the district court determined that there was probable cause for the search warrant because the warrant application stated that officers found Ziploc bags containing marijuana and methamphetamine residue in the trash outside M.S.'s residence and included information indicating that Keodouangdy had been staying at the residence and had recent connections with drug activity. Furthermore, the facts stated in the search warrant connect the evidence to be seized to the place to be searched, and they connect both the evidence and the place to Keodouangdy. There is no information in the record indicating that any of the facts in the application were unreliable. Even if the issuing judge should not have

considered the information about the evidence seized in the Wyoming traffic stop—the only challenge Keodouangdy arguably preserved—the totality of the circumstances provided a substantial basis for the district court to find probable cause for the search warrant. We thus conclude that the issuing judge had a substantial basis to conclude that probable cause existed, and the district court did not err by admitting the evidence seized as a result of the search warrant.

**II.    The evidence was sufficient to prove that Keodouangdy constructively possessed the firearm.**

Keodouangdy argues that the state failed to present sufficient evidence to prove beyond a reasonable doubt that he constructively possessed the firearm because (1) the state did not present direct evidence of possession and (2) the circumstantial evidence is consistent with at least one reasonable hypothesis other than guilt. The state argues that it proved that Keodouangdy had exclusive control over the bedroom through direct evidence and that the direct-evidence standard of review applies. In the alternative, the state argues that, even if the circumstantial-evidence standard of review applies, the circumstances proved are sufficient to establish that Keodouangdy exercised dominion and control over the firearm.

"Possession may be proved through evidence of actual or constructive possession." *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). Actual possession requires proof that the defendant physically possessed the contraband on their person at the time of arrest; conversely,

> [t]he purpose of the constructive-possession doctrine is to include within the possession statute those cases where the

11

> state cannot prove actual or physical possession at the time of arrest but where the inference is strong that the defendant at one time physically possessed the [contraband] and did not abandon his possessory interest in the [contraband] but rather continued to exercise dominion and control over it.

*State v. Florine*, 226 N.W.2d 609, 610 (Minn. 1975). Constructive possession may be proved by showing that the contraband was found "in a place under defendant's exclusive control to which other people did not normally have access." *Id.* at 611. But if the contraband was found "in a place to which others had access," the state must prove that "there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over [the contraband]." *Id.* Mere proximity or ease of access to a firearm is insufficient; rather, "the State must prove that the defendant had an ability and intent to exercise dominion and control over the firearm." *Harris*, 895 N.W.2d at 602.

When evaluating the sufficiency of direct evidence, "we conduct a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017) (quotation omitted). But when evaluating the sufficiency of circumstantial evidence, we apply a heightened two-step review. *Id.* Here, we need not resolve the issue of which standard applies because, even under the heightened circumstantial-evidence standard, we are persuaded that the evidence was sufficient to support Keodouangdy's conviction. *See State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013) (declining to resolve which standard of review applied because the evidence was sufficient under either standard).

Under the circumstantial-evidence standard, we begin by identifying the circumstances proved at trial, viewing conflicting evidence in the light most favorable to the verdict. *State v. Andersen*, 784 N.W.2d 320, 329-30 (Minn. 2010). Then, we independently examine the reasonable inferences that may be drawn from those circumstances to determine whether they are consistent with guilt and inconsistent with any rational hypothesis other than guilt. *Silvernail*, 831 N.W.2d at 599. In doing so, we review the evidence as a whole and do not defer to the fact-finder's choice between reasonable inferences. *Id.*

In the first step, we identify the circumstances proved at trial; here, the circumstances proved include the following:

- M.S. owned the residence.

- M.S. answered the door when officers knocked and announced their presence, and officers escorted him outside immediately.

- M.S. and Keodouangdy were the only two people at the residence on the day of the search.

- T.M. found Keodouangdy asleep in the southeast bedroom.

- M.S. occupied a different bedroom in the house.

- When T.M. first attempted to open the door to the southeast bedroom, the door handle was locked, but T.M. pushed the door open without much force and without a key.

- The bedroom was cluttered with personal belongings.

- Keodouangdy was sleeping on the bed next to a laundry basket and other items.

- T.M. attempted to wake Keodouangdy multiple times before he awoke and stood up.

- On the side of the bed furthest from the wall, underneath where Keodouangdy had been sleeping, T.M. found a driver's license, identification card, and bank card, each of which bore Keodouangdy's name.

- On the side of the bed nearest the wall, T.M. found loose clothes and blankets, a red bag, a cell-phone charger, and a laundry basket full of clothing.

- On top of the bedding where Keodouangdy had been asleep, A.K. found a firearm in the center of the bed.

- The firearm's serial number was scrubbed off, and there was ammunition in the magazine.

- In A.K.'s training and experience, firearms with serial numbers scrubbed off are typically stolen and individuals scrub the serial numbers off so that the firearm is untraceable.

- An employment portfolio with Keodouangdy's name on the cover and a piece of mail addressed to Keodouangdy at a different address were on the dresser next to the bed.

- The bedroom did not contain items identified as belonging to anyone other than Keodouangdy.

- Keodouangdy was prohibited from possessing a firearm.

- When officers exited the bedroom, the door was not damaged and was able to close shut.

Having identified the circumstances proved, we turn to the second step of the analysis: whether the circumstances proved, viewed as a whole, are consistent with Keodouangdy's guilt of unlawful possession of a firearm and inconsistent with any rational hypothesis other than his guilt. Viewing the circumstances proved here, we conclude that they are consistent with guilt because the firearm was found in a place over which Keodouangdy was exercising dominion and control—on the bed on which he was found

asleep in the bedroom that contained personal items established as belonging to him. It is reasonable to infer that this was "a place under defendant's exclusive control to which other people did not normally have access." *Florine*, 226 N.W.2d at 611. Even if we were to infer that M.S. had access to the bedroom, notwithstanding that the bedroom door could lock, the evidence here shows that Keodouangdy was consciously exercising dominion and control over the firearm. Keodouangdy was staying in the bedroom, no one else was living in it, he was able to lock the door, and the firearm was located with his personal belongings and within his reach while he slept. We therefore conclude that the circumstances proved are consistent with Keodouangdy's possession of the firearm.

Keodouangdy argues that the circumstances proved are consistent with a rational hypothesis other than guilt, presenting the following theory: when M.S. heard officers knock and announce their presence, M.S., without Keodouangdy's knowledge and while Keodouangdy slept, placed the firearm on the bed before answering the front door to let officers into the residence. Keodouangdy posits that this hypothesis is reasonable because (1) M.S. could have opened and closed the bedroom door as easily as T.M. did, notwithstanding that it had been locked; (2) the firearm was hidden from Keodouangdy's view among the other items on the bed; (3) if he had felt the firearm underneath him while he was sleeping, he would have removed it from the bed to avoid being poked by it; and (4) if he had known the firearm was on the bed, he would have made "furtive movements" when awoken by the investigator.

But "[a]n alternative theory does not justify a new trial if that theory is not plausible or supported by the evidence." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn. 1998). And

15

we may not "overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quoting *Lahue*, 585 N.W.2d at 789). Neither inconsistencies in the state's case, nor possibilities of innocence, require reversal "so long as the evidence taken as a whole makes such [alternative] theories seem unreasonable." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008).

We conclude that Keodouangdy's theory is unreasonable and inconsistent with the circumstances proved. Here, the state proved that M.S. came to the door when the officers knocked and that A.K. found the firearm in the middle of the bed on top of the bedding between the side of the bed on which Keodouangdy had been sleeping and the wall. And even if M.S. could have entered the bedroom as easily as T.M. did, it is unreasonable to infer that M.S. placed the firearm there. That theory requires an inference that M.S. would risk being caught in the act of planting the firearm by entering the bedroom, reaching over Keodouangdy while he was sleeping, placing the firearm on the bed, and firmly closing and locking the door on his way out, all while officers were knocking on the front door.

Keodouangdy asserts that his lack of furtive movements upon being awoken by law enforcement is inconsistent with an inference of guilt, and therefore, this case is like *Harris*, in which circumstantial evidence was insufficient to prove constructive possession of a firearm that was wedged between the headliner and roof of the vehicle the defendant was driving. 895 N.W.2d at 602-03. But *Harris* does not stand for the proposition that a lack of furtive movements alone is sufficient to overturn a jury verdict. Several of the circumstances proved in that case supported a reasonable hypothesis other than guilt. In

16

*Harris*, the defendant did not own the vehicle, there were other people in the vehicle, the firearm was not immediately visible or recognizable, the defendant made no suspicious movements and did not reach for the firearm, and DNA test results were inconclusive. *Id.* *Harris* is therefore distinguishable.

Because the circumstances proved here are consistent with Keodouangdy's constructive possession of the firearm and inconsistent with any rational hypothesis other than guilt, we conclude that the state presented sufficient evidence to support Keodouangdy's conviction for unlawful possession of a firearm.

In sum, because the search warrant was supported by probable cause and because the state presented sufficient evidence to prove that Keodouangdy constructively possessed the firearm, we affirm Keodouangdy's conviction for unlawful possession of a firearm.

**Affirmed.**

17