**Ryedelle Reginald LOVING, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**A15-1111**

Supreme Court of Minnesota.

Filed: March 22, 2017

640

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Brittany D. Lawonn, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

STRAS, Justice.

## OPINION

Ryedelle Reginald Loving is currently serving a sentence of life imprisonment without the possibility of release for his conviction of first-degree premeditated murder for a shooting that occurred at a Minneapolis gas station. In addition to causing the death of one victim, the encounter also led to two other convictions for Loving, both for attempted first-degree premeditated murder, based on shots he fired at two other individuals. We affirm these convictions.

## FACTS

This case involves a dispute over an alleged $80 debt. Just a few days before the shooting, Loving gave $80 to R.M. to reimburse him for some items that Loving had allegedly stolen from R.M. and his mother. Unhappy with making the payment, Loving unsuccessfully urged R.M. to

return the funds in two separate telephone calls. When R.M. and Loving crossed paths at an Old Colony gas station a few days later, the tragic events of this case unfolded.

R.M.; his brother, Gilbert Jordan; and their friend, L.I., arrived at the gas station in a tan van. Loving, meanwhile, arrived in a green Cadillac Bonneville sedan driven by his associate, E.L. Loving and R.M. encountered each other briefly at the pay window of the gas station, and though they may have interacted, the men did not confront one another. In fact, right after both men paid for their gas, they returned to their vehicles without incident.

However, when Loving returned to the car, E.L. noticed that Loving's demeanor had changed. According to E.L., Loving had been "happy and cool" before encountering R.M., but "seemed nervous" and "agitated" when he returned. Even though E.L. and Loving left together, E.L. stopped and exited the car just one block from the gas station because Loving was visibly upset and "it didn't look like it was a good situation."

Immediately thereafter, Loving, now the driver of the green Bonneville sedan, returned to the gas station, circled the gas-station grounds, and then drove toward the tan van. When R.M. saw Loving's vehicle approaching, he grabbed a gun, placed it in his waistband, and jumped out of the van. L.I. and Jordan followed R.M. from the van, but neither had a gun. As Loving drove toward the group, he leaned out of the car and said, "what is up with the money?" Loving then began shooting at R.M., L.I., and Jordan, all of whom attempted to take cover. Before they could do so, Loving fired at least seven shots, one of which killed Jordan and several others of which injured L.I. and R.M. R.M. never had an opportunity to pull the gun

from his waistband before Loving's vehicle sped away.

The next day, police officers discovered a burning green vehicle in north Minneapolis, which, according to a forensic examiner, had unique characteristics that matched the green Bonneville sedan observed in the surveillance footage from the gas station. Later that same day, a witness saw Loving with burns on his face and hands. The evidence at trial also established that Loving called his ex-girlfriend the evening after the shooting and told her that he had done something wrong and that he needed to leave town. Two days later, police officers arrested Loving for the gas-station shooting.

A grand jury indicted Loving on six counts. Two of the counts, first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2016); and first-degree murder while committing a drive-by shooting, Minn. Stat. § 609.185(a)(3) (2016), were for Jordan's death. The others—two counts of attempted first-degree premeditated murder, Minn. Stat. §§ 609.185(a)(1), 609.17 (2016); and two counts of attempted first-degree murder while committing a drive-by shooting, Minn. Stat. §§ 609.185(a)(3), 609.17—were for the shots fired at R.M. and L.I.

A jury found Loving guilty, and the district court convicted him, of all six counts. On the attempted-murder counts, the court imposed concurrent sentences of 220 months and 240 months in prison. On the first-degree-premeditated-murder count, the court sentenced Loving to life imprisonment without the possibility of release. The court did not impose separate sentences for any of the three drive-by-shooting counts.

Rather than filing a direct appeal, Loving challenged his convictions by filing a petition for postconviction relief. The petition raised a number of claims, including

the insufficiency of the evidence on all counts, instructional error on the drive-by-shooting counts, evidentiary error, and a request for the postconviction court to review the nontestimonial portions of the grand-jury transcript. The postconviction court denied Loving's petition in its entirety. Loving appeals the postconviction court's decision.

## ANALYSIS

### I.

 The first question presented by this case is whether the evidence on the premeditated-murder counts was sufficient. When considering a claim of insufficient evidence, we conduct " 'a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict.' " *Staunton v. State*, 784 N.W.2d 289, 297 (Minn. 2010) (quoting *State v. Ferguson*, 742 N.W.2d 651, 658 (Minn. 2007)). We have called this the traditional standard of review, which applies whenever the direct evidence establishing a particular element of a crime is alone sufficient to support the jury verdict. *See State v. Horst*, 880 N.W.2d 24, 39 (Minn. 2016).

 When the direct evidence of guilt on a particular element is not alone sufficient to sustain the verdict, however, we apply a heightened two-step standard, which we have called the circumstantial-evidence standard of review. *Id.* In the first step, we identify the circumstances proved by the State. *State v. Bahtuoh*, 840 N.W.2d 804, 810 (Minn. 2013). We defer at this stage to the jury's acceptance of the State's evidence and its rejection of any evidence in the record that is inconsistent with the circumstances proved by the State. *State v. Anderson*, 789 N.W.2d 227,

241-42 (Minn. 2010). After identifying the circumstances proved, we move on to the second step, which "requires us to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt." *Bahtuoh*, 840 N.W.2d at 810. We do not defer to the jury at this stage, but rather we "independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt." *Anderson*, 789 N.W.2d at 242 (citation omitted) (internal quotation marks omitted). If a reasonable inference other than guilt exists, then we will reverse the conviction. *See State v. Al-Naseer*, 788 N.W.2d 469, 481 (Minn. 2010).

 Loving challenges the sufficiency of the evidence on his convictions of first-degree premeditated murder and attempted first-degree premeditated murder, which required the State to prove, beyond a reasonable doubt, that Loving premeditated the killing. Minnesota Statutes § 609.18 (2016) defines premeditation as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." There is no direct evidence in this case that Loving premeditated Jordan's murder or the attempted murders of R.M. or L.I. Loving did not say, for example, "I planned the murder." *See, e.g., Horst*, 880 N.W.2d at 40 (providing examples of statements by the defendant that would constitute direct evidence of the defendant's state of mind at the time of the killing). Accordingly, as in most cases involving a state of mind, the State proved the element of premeditation through circumstantial evidence, which requires us to apply the circumstantial-evidence standard of review. *See State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015) (noting that "[i]t is rare for the State to establish a

defendant's state of mind through direct evidence").

Several basic principles about premeditation guide our analysis. First, we have explained that, although a defendant does not have to engage in extensive planning or deliberate for a specific amount of time, the formation of intent and premeditation cannot occur simultaneously. *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012). Instead, the State must prove that, " 'after the defendant formed the intent to kill, some appreciable time passed during which the consideration, planning, preparation or determination ... prior to the commission of the act took place.' " *Id.* (quoting *State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992)). Second, we examine the evidence as a whole, including the actions taken by the defendant before and after the crime, to determine whether premeditation existed. *See id.* Three categories of evidence are particularly helpful in evaluating whether premeditation existed: planning activity, motive, and the nature of the killing. *Id.*

The chronology of events and the choices that Loving made after leaving the gas station are evidence of planning activity. First, although Loving and R.M. encountered each other at the pay window without incident, E.L. decided to exit the car after traveling just one block because Loving appeared "agitated" and "it didn't look like it was a good situation." E.L. made these observations just moments after Loving had encountered R.M. at the pay window. Second, Loving, who was initially a passenger in the green Bonneville sedan, headed straight back to the gas station once he became the vehicle's sole occupant. When Loving arrived at the gas station, rather than driving directly toward the tan van, he first circled the gas-station grounds, asked R.M. about the money, and then opened fire on the group. This chronology of events, and especially Loving's decision to return to the gas station, are circumstances proved by the State that show that Loving engaged in planning activity prior to the attack.

The State also presented evidence of Loving's motive. Due to an earlier alleged burglary, Loving gave $80 to R.M. to reimburse him for the value of some of the items taken, including items that had belonged to R.M.'s mother. R.M. had asked for the money because he suspected that Loving was one of the individuals who committed the burglary. Even so, Loving was unhappy with making the payment, as evidenced by the fact that he called R.M. twice to ask him to return the money. Later, before opening fire on R.M. at the gas station, Loving asked, "what is up with the money?" Therefore, the State established, as a circumstance proved, that the parties' longstanding monetary dispute provided Loving with a motive for the crimes.

The State also proved several circumstances regarding the nature of the killing that were relevant to premeditation. Although Loving discharged the gun in rapid-fire fashion, three of the seven bullets hit vital areas of the victims. For example, the bullet that struck Jordan went through his back and severed his spinal cord. Likewise, two of the rounds hit R.M. in the chest, close to a number of vital organs. *See State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn. 2003) (considering the deliberate placement of the bullets "at vital areas of the body" as evidence of premeditation). Rather than calling for help or stopping his vehicle after the shooting, Loving fled in the green Bonneville sedan at such high speed that none of the victims had a chance to respond to the attack. Loving's actions instead left all three victims bleeding on the ground in the gas-station parking lot. These actions are relevant to a

determination of whether a criminal defendant has premeditated a murder. *See State v. Cox*, 884 N.W.2d 400, 413 (Minn. 2016) (citing *State v. Ortega*, 813 N.W.2d 86, 101 (Minn. 2012)); *State v. Yang*, 774 N.W.2d 539, 561-62 (Minn. 2009).

The only reasonable inference from the totality of the evidence is that the shootings were premeditated acts. *See State v. Andersen*, 784 N.W.2d 320, 332 (Minn. 2010). Although Loving did not attack or otherwise confront R.M. at the pay window, it is clear from the circumstances proved—particularly based on E.L.'s testimony and the two telephone calls—that Loving became increasingly agitated over the $80 he had given to R.M. During the one-block drive away from the gas station, when he spoke to E.L., and the drive back alone, Loving had time to "plan or prepare" for the shootings and to "determine to commit" them. *See* Minn. Stat. § 609.18. In fact, it appears that he continued to consider his options by circling the gas-station grounds before committing to the attack. At that point, he fired seven shots in rapid succession, three of which hit vital areas of the victims, and then, rather than stopping or providing assistance, he immediately fled the scene. Under these circumstances, the only reasonable inference is that Loving premeditated the shootings.

Loving argues that another reasonable hypothesis exists: the possibility of a spur-of-the-moment shooting, which he suggests finds support in the weak evidence of motive, the fact that he did not immediately attack R.M. at the pay window, and the fact that R.M. approached Loving's car before the shooting. Loving's alternative hypothesis is unreasonable. It would require us to accept the notion that Loving made a conscious decision to return to the gas station, circle the gas-station grounds, and stop the green Bonneville sedan very close to the tan van, all for a reason other than to attack R.M. Yet none of the evidence presented, and certainly none of the evidence on which the jury relied to convict Loving, suggests that he had some other purpose for returning to the gas station.

It is true that Loving did not attack R.M. at the pay window, and that R.M. walked toward Loving's car before the shooting started. But these facts, given the other circumstances proved by the State, arguably make the inference of premeditation stronger. Either the brief interaction at the pay window angered Loving, as evidenced by his demeanor after returning to the vehicle, or Loving was simply waiting for a better opportunity to attack R.M. In either case, Loving had time to think about his next steps, which eventually culminated in returning to the gas station and opening fire on the group. And the fact that R.M. walked toward Loving's vehicle is consistent with the theory that either R.M. did not initially see Loving's gun or that Loving waited until R.M. left the van before opening fire because it placed him in a better tactical position. Neither possibility undermines the jury's guilty verdicts, especially because we must consider the circumstances proved as a whole. Accordingly, we conclude that the only reasonable inference from all of the circumstantial evidence presented by the State is that the shootings were premeditated.

## II.

The second question presented by this case is whether the district court deprived Loving of a meaningful right to present a complete defense when it limited his ability to question witnesses about past violent incidents at the gas station. During cross-examination of various law-enforcement officers, the court restricted defense counsel's ability to inquire about these other incidents, concluding that such questioning

was not relevant "absent a better connection" between those events and "what was going through [Loving's mind]" when he fired upon the victims. On appeal, Loving challenges the ruling, arguing that it deprived him of his due-process right to a fair trial by impeding his ability to present a self-defense claim.

Like all criminal defendants, Loving had a constitutional "right to a meaningful opportunity to present a complete defense." *State v. Pass*, 832 N.W.2d 836, 841 (Minn. 2013). Included within this right was "the ability to present ... witness testimony." *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). However, as we have noted, "a defendant's due process right to present a complete defense yields to the application of an evidentiary rule unless the rule 'infringe[s] upon a weighty interest of the accused and [is] arbitrary or disproportionate to the purposes [the rule is] designed to serve.'" *Pass*, 832 N.W.2d at 841-42 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324-25, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006)).

The district court excluded the evidence under Minn. R. Evid. 402, which requires evidence to be relevant to be admissible, due to the lack of a connection between the prior incidents and Loving's state of mind. In other cases, we have evaluated similar claims involving the admissibility of evidence allegedly offered in support of a self-defense claim under an abuse-of-discretion standard of review, even in the face of an allegation that the exclusion of the evidence violated a defendant's right to a meaningful opportunity to present a complete defense.[1] *See, e.g., Penkaty*, 708 N.W.2d at 201. Applying this framework, we conclude that, in this case, the court did not abuse its discretion.

The relevance of the evidence, as the district court observed, depended on whether the prior gas-station incidents made any fact relating to the elements of Loving's self-defense claim "more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Under Minnesota law, the State had the burden to disprove each of the following elements of Loving's self-defense claim beyond a reasonable doubt:

(1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*State v. Johnson*, 719 N.W.2d 619, 629 (Minn. 2006) (quoting *State v. Basting*, 572

---

1. Although he labels it as a constitutional challenge, Loving does not appear to be making a constitutional argument at all. Indeed, other than citing the Fourteenth Amendment to the United States Constitution and two due-process cases, the bulk of Loving's argument is about whether the district court abused its discretion in limiting defense counsel's ability to inquire about the prior incidents. Even so, to the extent that Loving argues that Rule 402 is unconstitutional because it deprived him of his right to a meaningful opportunity to present a complete defense, we reject his argument. Rule 402, like Minn. R. Evid. 403, which we addressed in *Pass*, is "unquestionably constitu-

tional." 832 N.W.2d at 843 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion)). Rule 402, a longstanding and foundational evidentiary rule that permits a district court to exclude irrelevant evidence from trial, does not resemble any of the rules that the Supreme Court has identified as "arbitrary or disproportionate." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); *see Holmes*, 547 U.S. at 324-26, 126 S.Ct. 1727 (discussing instances in which the Supreme Court has invalidated arbitrary or disproportionate evidentiary rules).

N.W.2d 281, 285 (Minn. 1997)). However, before the burden shifted to the State, Loving first had to satisfy a burden of production by coming forward with evidence in support of his claim. *Id.* The testimony about the other violent incidents was relevant, in Loving's view, both to satisfy his initial burden of production and to rebut the State's evidence, particularly on the second and third elements of his self-defense claim. We disagree.

Our decision in *State v. Nystrom* confirms that the district court's decision to limit the testimony about the other violent incidents at the gas station was not an abuse of discretion. 596 N.W.2d 256 (Minn. 1999). The district court in *Nystrom* excluded expert testimony from a former police officer that, "because of high crime in [North Minneapolis], it was reasonable for a young person … to so fear for his life that he would make a preemptive strike and kill any person who caused him such fear." *Id.* at 260. We upheld the court's evidentiary ruling because of "[t]he absence of some evidence tying the expert's proposed testimony to the [defendant]." *Id.*

The district court's decision in this case, and in particular its observation that Loving failed to connect the dangerous nature of the area to his own state of mind, is consistent with our reasoning from *Nystrom*. Loving did not present any evidence that he was involved in any of these prior incidents, that his friends were involved, or even that he knew about them. This case, in other words, involves a complete absence of any evidence connecting the prior incidents to Loving's state of mind. *See State v. Zumberge*, 888 N.W.2d 688, 695 (Minn. 2017) ("Specific-acts evidence is admissible on self-defense only if the defendant knew of the act at the time of the offense.").

Rather than directly addressing *Nystrom*, Loving instead encourages us to apply *State v. Spaulding*, a North Carolina Supreme Court case that affirmed an evidentiary decision to allow the defendant, other prisoners, and a former Commissioner of Corrections to testify that inmates housed in a certain wing of a prison "lived in a climate of constant fear." 298 N.C. 149, 257 S.E.2d 391, 397 (1979). According to *Spaulding*, the testimony was "relevant and material" to the defendant's self-defense claim in that case. *Id.*

Contrary to Loving's argument, however, *Spaulding* itself shows why the evidence in this case is inadmissible. *Spaulding* was clear that, "[t]o the extent this evidence tends to show then current conditions [in the prison] *and defendant's awareness of them*, it [was] admissible." *Id.* (emphasis added). Here, by contrast, the district court limited the evidence precisely because Loving had failed to prove that he was aware of any of the prior incidents. Based on *Nystrom* and consistent with *Spaulding*, we conclude that the district court did not abuse its discretion in limiting the past-violent-incidents evidence under Minn. R. Evid. 402.

## III.

The third question presented by this case is whether the postconviction court erred when it refused to review the grand-jury transcripts or disclose them to Loving's postconviction counsel. Loving requested a copy of the grand-jury transcript, both at trial and on postconviction review, because he believed that the prosecutor had committed misconduct by misleading the grand jurors about Loving's self-defense claim. At trial, the district court twice refused to release the grand-jury transcript to Loving's trial counsel, but reviewed it in camera and determined that there were "no grounds to dismiss the

indictment based on prosecutorial miscon-duct." The district court also denied Lov-ing's motion at the end of trial, immediate-ly before closing arguments were set to begin, to dismiss the grand-jury indict-ment.

Loving renewed his request to obtain the grand-jury transcript in his petition for postconviction relief, but this time his fo-cus was on the nontestimonial portions of the transcript. In the alternative, his peti-tion asked the postconviction court to first review the transcript to determine if the original district court judge erred in ruling that Loving's trial counsel was not entitled to the transcript. The postconviction court denied Loving's request under Minn. R. Crim. P. 18.04, which governs access to grand-jury transcripts. Loving now raises yet a third alternative on appeal: we should review the grand-jury transcript ourselves to determine if either of the first two judges made a mistake. None of Lov-ing's alternatives finds support in Rule 18.

Rule 18 provides rules for grand-jury proceedings, including establishing the or-ganization of the grand jury; describing who can be present during grand-jury pro-ceedings; and, as relevant here, establish-ing rules regarding grand-jury transcripts. Rule 18.04, subdivision 1, requires that "[a] verbatim record must be made of all state-ments made, evidence taken, and events occurring before the grand jury except deliberations and voting." The default rule is that "[t]he record may be disclosed only to the court or prosecutor." *Id.* However, in limited circumstances, when a criminal defendant makes a motion and shows good cause or that grounds "exist for a motion to dismiss the indictment because of mat-ters occurring before the grand jury," a court may order disclosure of the entire transcript, or certain "designated portions of it," to the defendant or defense counsel. *Id.*

The rules are less strict for the testimo-nial portions of the grand-jury transcript. Once a defendant files a motion, the court must order the disclosure of, among other things, the "defendant's grand jury testi-mony"; "the grand jury testimony of wit-nesses the prosecutor intends to call at the defendant's trial"; and in limited circum-stances, "the grand jury testimony of any witness" the defendant expects will give "relevant and favorable testimony for the defendant." Minn. R. Crim. P. 18.04, subd. 2. If the requested portions of the tran-script fall into one or more of the designat-ed categories, then the court must order the release of those portions of the tran-script upon motion by the defendant, sub-ject to a protective order, and no showing of good cause is necessary to obtain them. *Id.*

The two subdivisions of Rule 18.04 make clear that the ease with which de-fense counsel is able to obtain the tran-script depends on the nature of the re-quest. For certain testimonial portions of the grand-jury transcript, all the defen-dant has to do is ask and provide notice to the prosecutor. *See* Minn. R. Crim. P. 18.04, subd. 2. For everything else, the defendant may ask, but the court will only grant the request if there is a showing of "good cause" or "a showing that grounds may exist for a motion to dismiss the indictment." *See id.*, subd. 1. For the latter type of request, the use of the word "may" entrusts the decision to the sound discre-tion of the district court. *See Boitnott v. State*, 640 N.W.2d 626, 631 (Minn. 2002) (applying an abuse-of-discretion standard to the decision whether to allow defense counsel to view photographic exhibits that were shown to the grand jury).

This case is unusual because the district court did not give the defen-dant an immediate "yes or no" answer to his request. Rather, the court decided to

review the transcript in camera, presumably to determine whether any of the grounds for disclosure existed. After reviewing the relevant portions of the transcript, the court concluded that there were no grounds to dismiss the indictment for prosecutorial misconduct. Loving has not provided us, nor did he provide the postconviction court, with a reason to question the district court's decision. We have said that "[a] general claim that disclosure of grand jury transcripts will possibly reveal exculpatory evidence is not enough to demonstrate [good cause]." *Id.* Likewise, a general claim that the requested transcript will possibly reveal prosecutorial misconduct, especially in the face of a contrary finding by the district court, is not enough to demonstrate good cause. We therefore conclude that the postconviction court did not abuse its discretion when it made the decisions to forego a duplicative second review of the grand-jury transcript and to not turn over the requested portions to defense counsel.

■ Loving fares no better with his argument that we should review the disputed portions of the grand-jury transcript ourselves. In support of his request, he relies on two cases, *State v. Paradee*, 403 N.W.2d 640 (Minn. 1987), and *State v. Hummel*, 483 N.W.2d 68 (Minn. 1992), both of which arose in the context of how to treat privileged and confidential material. The flaw in Loving's analogy, however, is that neither *Paradee* nor *Hummel* involved a specific rule governing the treatment of the materials in question. Here, by contrast, Rule 18.04 strictly regulates motions for the disclosure of a grand-jury transcript. In any event, to the extent Loving relies on these two cases, they both contemplate in camera review by the *trial court*, not us, which is what has already occurred in this case. *See Hummel*, 483 N.W.2d at 72; *Paradee*, 403 N.W.2d at 642.

Under these facts, therefore, we conclude that Loving is not entitled to relief on his request for the grand-jury transcripts to be reviewed for a second time.

### IV.

In his petition for postconviction relief, Loving raised two arguments relating exclusively to the three drive-by-shooting counts: the single count of first-degree murder while committing a drive-by shooting and the two counts of attempted first-degree murder while committing a drive-by shooting. He continues to challenge those counts on appeal, arguing that the evidence was insufficient on all three counts and that the district court's instruction on the predicate offense of drive-by shooting was plainly erroneous. Because we affirm Loving's convictions of first-degree premeditated murder and attempted first-degree premeditated murder, it is unnecessary for us to address these arguments on their merits. *See State v. Moua*, 678 N.W.2d 29, 42 n.10 (Minn. 2004) (declining to address a challenge to the sufficiency of the evidence supporting a drive-by-shooting conviction because the evidence was sufficient to support a first-degree-premeditated-murder conviction).

■ Nevertheless, the district court convicted Loving of six total offenses, including the three drive-by-shooting counts that are duplicative of the premeditated-murder and attempted-premeditated-murder counts on which the district court sentenced Loving. In the past, we have vacated convictions of unsentenced, duplicative offenses and left the jury's guilty verdicts on those counts intact. *See State v. Earl*, 702 N.W.2d 711, 723-24 (Minn. 2005) (vacating multiple first-degree-murder convictions that were based on the same conduct against the same victim, but leaving the guilty verdicts intact). We have explained that a defendant cannot be "convicted of

two counts of first-degree murder when both convictions are for the same offense, are on the basis of the same act, and involve the same victim[s]." *State v. Reese*, 692 N.W.2d 736, 743 (Minn. 2005) (holding, based on Minn. Stat. § 609.04 (2016), that the defendant could not be convicted of both first-degree premeditated murder and first-degree murder during the commission of an aggravated robbery). We follow this procedure here and accordingly remand to the district court with instructions to vacate Loving's three drive-by-shooting convictions, but otherwise leave the guilty verdicts for those counts in place.

## CONCLUSION

For the foregoing reasons, we affirm Loving's convictions of first-degree premeditated murder and attempted first-degree premeditated murder and remand to the district court to vacate Loving's convictions of first-degree murder while committing a drive-by shooting and attempted first-degree murder while committing a drive-by shooting.

Affirmed and remanded.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

MCKEIG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.