LARKIN, Judge
Appellant challenges his conviction of first-degree burglary under Minn. Stat. § 609.582, subd. 1(b), arguing that the evidence is insufficient to sustain the conviction. Specifically, appellant argues that the evidence is insufficient to show that he possessed, when entering or while in the burglarized building, an article fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon. We affirm.
FACTS
On June 14, 2016, appellant Deronti Rogers entered J.T.'s house, without her consent, several times during a 30-minute time span and stole several items, including two flat-screen televisions. J.T. was not home at the time. Rogers first entered J.T.'s house around 7:30 p.m. J.T.'s neighbor, G.B., saw Rogers kick the back door of J.T.'s house open. G.B. told her husband, D.B., what she had seen, and D.B. told G.B. to call the police and report the break-in. Several minutes later, G.B. saw Rogers leave J.T.'s house and carry a flat-screen television down the alley. Approximately five minutes later, G.B. saw Rogers walk back down the alley towards J.T.'s house accompanied by a juvenile who was wearing red shorts. Rogers entered J.T.'s house while the juvenile waited outside. Rogers came out of the house several minutes later and carried a second television away. Several minutes later, Rogers and the juvenile returned. D.B. saw Rogers enter and exit J.T.'s house one last time.
Shortly after Rogers left J.T.'s house for the third time, police arrived at the scene. Officer Tracy Boulton saw two males who matched a description that G.B. had provided walking northbound away from J.T.'s house. Boulton got out of her squad car and saw Rogers drop what she thought was a gun. She alerted her partner, Officer Bryce Turner, and she drew her Taser. The officers commanded Rogers and the juvenile to get on the ground. Rogers dropped a plastic bag filled with stolen property. The officers arrested Rogers and the juvenile.
Turner searched Rogers incident to arrest and found two television remote controls. The officers also recovered the item that Officer Boulton saw Rogers drop. It turned out to be an unloaded Daisy PowerLine Model 340 BB gun. G.B. and D.B. each identified Rogers, during separate show-up identifications, as the individual who had entered J.T.'s house. The officers transported Rogers to the Stearns County Jail. During the drive, Rogers told the officers that the gun that he dropped "was a plastic BB gun but it didn't have any BBs in it."
Later that night, J.T. learned of the burglary and returned home. The lock on her back door had been broken, and many of the rooms in her house were in disarray.
*689 J.T. told Officer Rachel Johnson that she was missing two flat-screen televisions, as well as several other items.
The on-call investigator, Officer Dwayne Bergsnev, received information that Rogers had gone to a nearby house before reentering J.T.'s house during the course of the burglary. Bergsnev obtained a warrant to search that house. A resident of the house told Bergsnev that Rogers was staying in the basement. During the search, Bergsnev found several items in the basement that J.T. had reported as stolen, including the two flat-screen televisions.
The state charged Rogers with one count of first-degree burglary and one count of second-degree burglary. Before trial, Rogers conceded that he had committed second-degree burglary, but he maintained that he was not guilty of first-degree burglary because he did not possess either a dangerous weapon or an article fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon as required under the charging statute. Rogers waived his right to a jury trial, and the case was tried to the court.
The district court found Rogers guilty of first- and second-degree burglary. The district court concluded that Rogers possessed the BB gun when entering or while in J.T.'s house but that it was not a dangerous weapon. However, the district court concluded that the BB gun was an article fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon because it looked like a real gun and did not have any of the identifying markers of a BB gun, such as an orange cap.
The district court entered judgments of conviction on both the first- and second-degree burglary counts[1] and sentenced Rogers on the first-degree burglary offense. Rogers moved for a dispositional and durational departure. The district court denied Rogers's request for a dispositional departure but granted his request for a durational departure, finding that "there [were] substantial and compelling reasons that this [crime was] less serious than typical." The district court sentenced Rogers to serve 36 months in prison, instead of 50-69 months, which was the presumptive sentencing range. Rogers appeals.
ISSUES
I. To sustain a conviction of first-degree burglary under Minn. Stat. § 609.582, subd. 1(b), based on the burglar's possession of an article fashioned in a manner to lead the burglary victim to reasonably believe it to be a dangerous weapon, must the state prove that the victim observed the article and subjectively concluded that it was a dangerous weapon?
II. Was the circumstantial evidence sufficient to prove that Rogers possessed an article fashioned in a manner to lead the burglary victim to reasonably believe it to be a dangerous weapon when entering or at any time while in the burglarized building?
ANALYSIS
Rogers contends that the evidence is insufficient to support his conviction of first-degree burglary.[2] When considering a claim of insufficient evidence, this court *690 closely reviews the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to allow the fact-finder to reach its verdict. State v. Webb , 440 N.W.2d 426, 430 (Minn. 1989). This court "use[s] the same standard of review in both bench and jury trials in evaluating the sufficiency of the evidence." State v. Barshaw , 879 N.W.2d 356, 363 (Minn. 2016). We will not disturb the verdict if the factfinder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. Bernhardt v. State , 684 N.W.2d 465, 476-77 (Minn. 2004).
Rogers raises two challenges to the sufficiency of the evidence. We address each in turn.
I.
Rogers first argues that "[t]he first-degree burglary conviction must be reversed because no evidence showed that the victim reasonably believed that [he] possessed an article used or fashioned as a dangerous weapon." Minnesota's first-degree burglary statute provides:
Whoever enters a building without consent and with intent to commit a crime, or enters a building without consent and commits a crime while in the building, either directly or as an accomplice, commits burglary in the first degree and may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $35,000, or both, if:
(a) the building is a dwelling and another person, not an accomplice, is present in it when the burglar enters or at any time while the burglar is in the building;
(b) the burglar possesses, when entering or at any time while in the building, any of the following: a dangerous weapon, any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or an explosive; or
(c) the burglar assaults a person within the building or on the building's appurtenant property.
Minn. Stat. § 609.582, subd. 1 (2014).
Rogers was convicted under subparagraph (b). More specifically, Rogers was convicted based on his possession of an "article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon."[3] This phrase is therefore the focus of our analysis.
Rogers argues, "[t]he plain language of the burglary statute requires that the victim reasonably believe the burglar has an article fashioned as a dangerous weapon," raising an issue of statutory interpretation. Matters of statutory interpretation are questions of law, which we review de novo. State v. Riggs , 865 N.W.2d 679, 682 (Minn. 2015). When interpreting a statute, our role is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2016). If the language of a statute is plain and unambiguous, it is presumed to manifest legislative intent and a court must give it effect.
*691 Burkstrand v. Burkstrand , 632 N.W.2d 206, 210 (Minn. 2001). "[I]f the Legislature's intent is clear from the statute's plain and unambiguous language, then we interpret the statute according to its plain meaning without resorting to the canons of statutory construction." Riggs , 865 N.W.2d at 683 (quotation omitted).
We therefore first ask whether the statute's language is ambiguous. State v. Peck , 773 N.W.2d 768, 772 (Minn. 2009). A statute is ambiguous if the language of the statute is subject to more than one reasonable interpretation. State v. Mauer , 741 N.W.2d 107, 111 (Minn. 2007). When determining whether the language of a statute is ambiguous, a court may consider the canons of interpretation listed in Minn. Stat. § 645.08 (2016).[4] Riggs , 865 N.W.2d at 682. One such canon provides that "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1). "Multiple parts of a statute may be read together so as to ascertain whether the statute is ambiguous." Christianson v. Henke , 831 N.W.2d 532, 537 (Minn. 2013). "[W]e do not examine different provisions [of a statute] in isolation." State v. Gaiovnik , 794 N.W.2d 643, 647 (Minn. 2011). In sum, "various provisions of the same statute must be interpreted in the light of each other, and the legislature must be presumed to have understood the effect of its words and intended the entire statute to be effective and certain." Van Asperen v. Darling Olds, Inc. , 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958).
Although the parties disagree on the meaning of the phrase, "fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon," they argue that the phrase is unambiguous and that each party's plain-language interpretation of the phrase is the correct one.
As to Rogers's interpretation, he argues that "[J.T.] and her children were 'the victim[s]' of the burglary" and that, therefore, "the state had to prove that they reasonably believed the BB gun was a dangerous weapon." Rogers reasons that because J.T. and her children were not home when the burglary occurred and never saw Rogers or the BB gun, "they were never led to reasonably believe that the BB gun was a dangerous weapon." Rogers argues, "If no victim is present at a burglary to be led to reasonably believe that an article is a dangerous weapon, then there can be no testimony about their beliefs and a defendant cannot be convicted under this clause." Rogers concludes that a "victim must be present for a conviction under this clause...."
In sum, Rogers contends that the plain language of the relevant phrase requires the victim to be present during the burglary, to observe the fashioned article, and to subjectively conclude that it is a dangerous weapon. The phrase does not set forth those requirements. In fact, the phrase does not refer to the presence of the victim. However, subparagraphs (a) and (c) of the same subdivision expressly refer to the presence of another person within or around the burglarized building. Compare *692 Minn. Stat. § 609.582, subd. 1(b), with Minn. Stat. § 609.582, subd. 1 (a) & (c) (providing for first-degree burglary if "the building is a dwelling and another person, not an accomplice, is present in it" or "the burglar assaults a person within the building or on the building's appurtenant property").
We read subparagraphs (a), (b), and (c) together when determining whether the language of section 609.582, subdivision 1, is ambiguous. See Riggs , 865 N.W.2d at 682-83. The absence of language referring to the presence of another person in or around the burglarized building in subparagraph (b), similar to the language in subparagraphs (a) and (c), refutes Rogers's argument that the relevant phrase plainly means that the burglary victim must be present during the burglary to observe the article fashioned as a dangerous weapon. See Seagate Tech., LLC v. W. Dig. Corp. , 854 N.W.2d 750, 759 (Minn. 2014) ("[A] condition expressly mentioned in one clause of a subdivision provides evidence that the Legislature did not intend for the condition to apply to other clauses in which the condition is not stated.").
In addition, the adjective "reasonable" is commonly used to describe an objective standard. See, e.g. , State v. Vang , 847 N.W.2d 248, 266 (Minn. 2014) (the standard of reasonableness for purposes of ineffective-assistance-of-counsel claims is an objective standard); Doe v. Archdiocese of St. Paul , 817 N.W.2d 150, 172 (Minn. 2012) (reasonable person standard is an objective standard); State v. Diede , 795 N.W.2d 836, 843 (Minn. 2011) (reasonable articulable suspicion requires an objective justification). We interpret the word "reasonable" according to this common and approved usage. See Minn. Stat. § 645.08(1). The word reasonably in subparagraph (b) therefore suggests an objective standard, and not the subjective standard that Rogers proposes. In other words, the relevant phrase does not require the burglary victim to observe the article fashioned as a dangerous weapon and to subjectively conclude that it is a dangerous weapon.
In sum, Rogers's proposed plain-language interpretation of the relevant phrase does not find support in the words within the phrase or in the surrounding text. The phrase does not state the requirements that Rogers reads into it: that the burglary victim must be present during the burglary, observe the article fashioned as a dangerous weapon, and subjectively conclude that it is a dangerous weapon. We therefore reject Rogers's proposed plain-language interpretation of the phrase.
We now turn to the state's proposed interpretation. The state contends, "By its plain terms, the statute prohibits non-consensual entry while possessing a particular type of object; namely, an object fashioned to lead the victim to reasonably believe it is a dangerous weapon." The state argues that the plain meaning of "fashioned" is "[t]o give shape or form to; make." The state argues that it is not necessary that the article be "used" in a manner suggesting it is a dangerous weapon "because the statute expressly provides that the article can be 'used or fashioned' in such a manner." The state concludes that "possession of the fashioned article during a burglary is sufficient to constitute first-degree burglary."
The state's interpretation of the relevant phrase is consistent with its plain wording, the surrounding text, and the common and approved usage of the word "reasonable." Once again, the express language of the phrase does not require the victim to be present, to observe the article, and to subjectively conclude that it is a dangerous weapon. It simply describes the necessary quality or appearance of the article that *693 the burglar must possess. We therefore hold that the plain language of Minn. Stat. § 609.582, subd. 1(b), does not require a burglary victim to be present, observe the article fashioned as a dangerous weapon, and subjectively conclude that it is a dangerous weapon. It is sufficient that the article's appearance supports an objective belief that it is a dangerous weapon.
A dangerous weapon is defined as "any firearm ... or any device designed as a weapon and capable of producing death or great bodily harm." Minn. Stat. § 609.02, subd. 6. In finding Rogers guilty under subparagraph (b), the district court reasoned: "Photographs of the BB gun show that it looks like a handgun. There was no orange cap or any other feature to distinguish it from a real firearm.... The BB gun was either designed or altered to look like a real firearm." The district court therefore determined that the state had "proved beyond a reasonable doubt" that the BB gun was "fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon." Given the plain meaning of the relevant phrase in Minn. Stat. § 609.582, subd. 1(b), the evidence is sufficient to sustain that determination. It was not necessary for J.T. to be present, observe the BB gun, and subjectively conclude that it was a dangerous weapon.
II.
Rogers next argues that "[t]he circumstantial evidence was insufficient to prove that [h]e possessed the BB gun 'when entering or at any time while in [J.T.'s house].' " Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." State v. Hokanson , 821 N.W.2d 340, 354 n.3 (Minn. 2012) (quotation omitted). Direct evidence is "evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." State v. Clark , 739 N.W.2d 412, 421 n.4 (Minn. 2007) (quotation omitted). Circumstantial evidence always requires an inferential step that is not required with direct evidence. State v. Harris , 895 N.W.2d 592, 599 (Minn. 2017).
Here, there is no direct evidence that Rogers possessed the BB gun when entering or while in J.T.'s house. Instead, his possession was proved circumstantially. Because the state relied on circumstantial evidence to prove Rogers's possession of the BB gun, we evaluate the sufficiency of the state's evidence using the two-step circumstantial-evidence standard. See State v. Al-Naseer , 788 N.W.2d 469, 473-75 (Minn. 2010) (applying the circumstantial-evidence standard to individual elements of a criminal offense that were proved by circumstantial evidence).
The first step of this standard requires us to determine the circumstances proved. Loving v. State , 891 N.W.2d 638, 643 (Minn. 2017). When evaluating the circumstances proved, we "disregard evidence that is inconsistent with the ... verdict." Harris , 895 N.W.2d at 601. "[E]ven though verdicts based on circumstantial evidence may warrant stricter scrutiny, [appellate courts] still construe conflicting evidence in the light most favorable to the verdict and assume that the [fact-finder] believed the State's witnesses and disbelieved the defense witnesses." State v. Tscheu , 758 N.W.2d 849, 858 (Minn. 2008). The second step requires us to determine if the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt. Loving , 891 N.W.2d at 643. We will only reverse a conviction based on circumstantial evidence if a reasonable inference other than guilt exists. Id.
"[P]ossibilities of innocence do not require reversal of a ... verdict so long as *694 the evidence taken as a whole makes such theories seem unreasonable." State v. Stein , 776 N.W.2d 709, 719 (Minn. 2010) (quotation omitted). Appellate courts "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." State v. Lahue , 585 N.W.2d 785, 789 (Minn. 1998). "[A] defendant is not relying on conjecture or speculation when the defendant ... points to evidence in the record that is consistent with a rational theory other than guilt." Al-Naseer , 788 N.W.2d at 480 (quotation omitted).
The district court's findings of fact set forth the circumstances proved as follows:
1. Rogers kicked open the back door to J.T.'s residence and remained in the residence for about five minutes before leaving with a flat-screen television.
2. About ten minutes later, Rogers reentered the residence through the back door and again emerged after about five to ten minutes carrying a different flat-screen television. At this point, a juvenile accomplice was with Rogers and stood outside of the house.
3. Rogers returned to the scene and reentered the house for a third time before exiting a few minutes later.
4. Police arrived as Rogers and his juvenile accomplice walked away from J.T.'s residence for the third time.
5. Officer Boulton saw Rogers drop what she believed to be a handgun as they were approaching Rogers and his juvenile accomplice. Officers placed both Rogers and the accomplice under arrest and determined the gun that Rogers dropped was actually a BB gun.
6. On his way to jail, Rogers accurately told Officers Boulton and Turner that the gun he dropped was actually an unloaded BB gun.
The circumstances proved are consistent with guilt. Rogers argues that the circumstances proved are also consistent with the rational hypothesis that he did not possess the BB gun until after he left J.T.'s house for the third time. His theory is as follows:
Rogers, having already been to the house and knowing it was unoccupied, had no need for the BB gun. A lookout, however, may have wanted the BB gun lest the occupants return. When [Rogers and the juvenile accomplice] left the third time, the juvenile walked away first. He dropped something by the garage as he passed by. Rogers then followed behind him. Neither G.B. nor D.B. had an unbroken view of the two before they were arrested: both lost sight of them at some point. Rogers then dropped the BB gun as Officer Boulton got out of the squad car.
Rogers hypothesizes that "[t]he juvenile had the gun while serving as lookout and then dropped it by the garage. Rogers picked it up while G.B. and D.B. lost sight of him." He asserts that "[t]his theory is based on evidence in the record." We disagree. There is no evidence in the record that anyone other than Rogers possessed the BB gun, much less the juvenile. Although G.B. mentioned on direct examination that she noticed the juvenile drop something by the garage, she also testified that she watched Rogers stand by the back door of the victim's house and then walk "kitty-corner right, and [then] north" into the alley. G.B. then watched Rogers and the juvenile walk down the alley immediately before their arrest, which would have been away from the item that the juvenile dropped. G.B. did not report seeing the juvenile hand anything to Rogers or seeing Rogers bend down and pick something up. Moreover, Officer Boulton testified that Rogers talked about the BB gun "as if it was his gun." And Rogers's remark that the BB gun did not contain *695 any BBs suggests that he possessed the BB gun for a longer period of time, and not merely immediately before he was apprehended by the police.
Because Rogers's hypothesis of innocence lacks evidentiary support and seems unreasonable, we reject it as being based on mere conjecture.
DECISION
The circumstantial evidence was sufficient to establish that Rogers possessed the Daisy PowerLine Model 340 BB gun when entering or at any time while in J.T.'s house. The evidence was also sufficient to establish that the BB gun was fashioned in a manner to support an objective belief that it was a dangerous weapon. Because the evidence was sufficient to establish, beyond a reasonable doubt, that Rogers was guilty of first-degree burglary, we do not disturb his first-degree burglary conviction.
Affirmed.

Because the issue is not raised in this appeal, we do not consider whether entry of judgments of conviction on both offenses violated Minn. Stat. § 609.04, subd. 1 (2014), which provides, "Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both."

Rogers does not challenge his conviction of second-degree burglary.

At trial, the state argued both that the BB gun was a dangerous weapon and that it was an article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon. A dangerous weapon is defined as "any firearm ... or any device designed as a weapon and capable of producing death or great bodily harm." Minn. Stat. § 609.02, subd. 6 (2014). The district court ruled that the BB gun was not a dangerous weapon. Because the issue of whether a BB gun is a dangerous weapon is not raised in this appeal, we leave its resolution for another day.

The supreme court has "distinguished between the 'canons of interpretation' in section 645.08 and other canons, described as 'canons of construction' that may be considered only after concluding that a statute is ambiguous." Riggs , 865 N.W.2d at 682 n.3 ; see State v. Nelson , 842 N.W.2d 433, 445 (Minn. 2014) (Dietzen, J., dissenting) ("We use the 'canons of interpretation' set forth in section 645.08 to determine the threshold issue of whether the statutory language is unambiguous."); Laase v. 2007 Chevrolet Tahoe , 776 N.W.2d 431, 435 (Minn. 2009) ("We have utilized the 'canons of interpretation' set forth in Minn. Stat. § 645.08 in determining the plain meaning of a statute without first concluding that the statute was ambiguous.").