*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0142**

State of Minnesota,
Respondent,

vs.

Ali Ahmed Omar,
Appellant.

**Filed April 8, 2024**
**Affirmed**
**Bratvold, Judge**

Hennepin County District Court
File No. 27-CR-22-16791

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam Petras, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Travis Kowitz, Erin E. Powers, Kowitz Law, Lindstrom, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Smith, Tracy M., Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

In this direct appeal from the judgment of conviction for unlawful possession of a firearm, appellant argues that (1) his conviction should be reversed because the evidence was insufficient to prove beyond a reasonable doubt that he constructively possessed the

firearm found under his car seat and, in the alternative, (2) he is entitled to a new trial because he received ineffective assistance of counsel. We conclude that the circumstantial evidence is sufficient to sustain appellant's conviction. We do not decide the second issue because the record on appeal is insufficient to determine appellant's ineffective-assistance-of-counsel claim, which may be raised in a subsequent postconviction petition. Thus, we affirm.

**FACTS**

Respondent State of Minnesota charged appellant Ali Ahmed Omar with one count of unlawful possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2022), in August 2022. The state's complaint alleged that Omar constructively possessed a firearm recovered from the area below his seat in a sedan that was stopped and searched by law enforcement.[1] The parties stipulated that Omar was "prohibited from possessing a firearm under Minnesota law."

The following summarizes the evidence received during Omar's jury trial in November 2022.

On August 24, 2022, shortly before 7:30 p.m. and while it was still light outside, a special agent for the Minnesota Bureau of Criminal Apprehension (BCA) participated in a joint effort among several law-enforcement agencies and was surveilling a section of Lake Street South in Minneapolis. The special agent noticed a silver Pontiac sedan that did not

---

[1] Omar moved to suppress evidence from law enforcement's search of the sedan. The district court denied the motion to suppress, and Omar does not challenge that decision on appeal.

2

have front or rear license plates. The special agent saw the sedan's driver and front-seat passenger wearing full-face masks similar to balaclavas or ski masks. The special agent noted that the face masks were strange because it was August and the temperature outdoors was in the low 80s. In the special agent's experience, wearing a ski mask is a "common practice" for people engaged in "criminal activities" as a way to conceal identity. The special agent followed the sedan, which "substantially pick[ed] up speed," travelling up to 50 miles per hour. The sedan failed to stop at two red lights and passed other vehicles by driving "around the center line" and "on the shoulder." Because the special agent was in an unmarked squad car, he asked another law-enforcement officer to initiate a traffic stop.

When the marked squad car turned on its emergency lights, the sedan did not stop and continued driving until an unmarked squad car pulled in front of it and forced the sedan to stop. A law-enforcement investigator later testified that, based on the investigator's experience, when a driver attempts to evade the police, they are concealing evidence, planning to flee, or "forming a plan."

The sedan had three occupants—the driver and passengers in the front and back seats. As law enforcement officers approached the sedan, they noticed the smell of marijuana coming from inside the sedan; Omar was in the front passenger seat. The investigator noticed that Omar was "kind of leaning his body turned towards" the driver's door "but more towards the back of the vehicle with his hands kind of towards the center console." The back-seat passenger was "slouched over" and "appeared to be using his elbows to kind of shift something that was in his waistband."

All three occupants complied when law enforcement asked them to exit the sedan. Law enforcement pat-searched the driver and found a suspected controlled substance in his pocket. A pat search of the back-seat passenger uncovered a firearm in his waistband. The officers pat-searched Omar and found nothing on his person.

When officers searched the sedan, they found a firearm tucked "[d]irectly underneath the passenger seat where [Omar] was seated" with the grip "sticking up . . . towards the glove box" and the barrel or "nozzle" pointing towards the back of the car. The investigator testified that he saw the firearm while standing outside the sedan when he "tilted [his] head and looked a little bit under the seat."

The investigator also testified that "[t]he firearm was placed under the seat in such a way that only the front passenger would have had immediate access to it." The investigator stated that it would have been "nearly impossible for anyone else in the vehicle to access that firearm or to have placed it there without [Omar] knowing" because the firearm was visible from the outside of the car and there was a "cage" under the seat that would have made it "almost nearly impossible" for someone in the back seat to reach the weapon. Law enforcement took photos of the firearm in the sedan, but shadows obscure the relevant area, and no firearm is visible in the photos.

All three of the sedan's occupants were prohibited from possessing a firearm. Two forensic scientists testified at trial. Although they had DNA and fingerprint evidence from Omar, they were unable to recover any latent fingerprints from the firearm and did not recover sufficient DNA from the firearm to reach any conclusions.

4

The jury found Omar guilty of unlawful possession of a firearm. The district court sentenced Omar to 60 months in prison. This appeal follows.

**DECISION**

**I.    The circumstantial evidence is sufficient to sustain Omar's conviction for unlawful possession of a firearm.**

Omar argues that "[t]he evidence that Omar constructively possessed the firearm found underneath the passenger seat of the vehicle was insufficient." "When evaluating the sufficiency of the evidence, appellate courts carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt . . . ." *State v. Griffin*, 887 N.W.2d 257, 263 (Minn. 2016) (quotation omitted). Appellate courts must view the evidence "in the light most favorable to the verdict" and must assume "that the fact-finder disbelieved any evidence that conflicted with the verdict." *Id.*

We agree with the parties that the record includes only circumstantial evidence to show that Omar constructively possessed the firearm found under the passenger seat. "When the direct evidence of guilt on a particular element is not alone sufficient to sustain the verdict," appellate courts apply the circumstantial-evidence standard of review. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist" and "always requires an inferential step to prove a fact that is not required with direct evidence." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotation omitted).

Appellate courts apply a two-step analysis when reviewing the sufficiency of circumstantial evidence. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, the appellate court must "identify the circumstances proved." *Id.* In doing so, the appellate court "defer[s] to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598-99 (quotations omitted). Appellate courts also "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008). In other words, when "determining the circumstances proved, [appellate courts] consider only those circumstances that are consistent with the verdict." *Silvernail*, 831 N.W.2d at 599.

Second, appellate courts must "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). Appellate courts "review the circumstantial evidence not as isolated facts, but as a whole," and "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved." *Id.* (quotations omitted). If an alternative hypothesis is "untied to the evidence before the jury," that hypothesis is "wholly speculative" and does not warrant reversal. *State v. German*, 929 N.W.2d 466, 475 (Minn. App. 2019).

Proceeding with the first step, we identify the following circumstances as proved and consistent with the jury's verdict: Omar was a front-seat passenger in a silver Pontiac sedan that had no license plates and was travelling on city streets during daylight. The

6

driver and Omar wore ski masks, even though it was over 80 degrees outside. Wearing ski masks is "common practice" for those involved in criminal activity. As law enforcement followed the sedan, it sped up to 50 miles per hour, ran two red lights, and passed other cars by crossing the center line or driving on the shoulder. When a marked squad car turned on its emergency lights to initiate a traffic stop, the sedan stopped only when an unmarked squad car pulled in front of it. Attempting to evade law enforcement is also linked to criminal activity, such as concealing evidence or fleeing from police.

Officers noticed the smell of marijuana coming from inside the sedan. Officers saw Omar "kind of leaning his body turned towards" the driver's door "but more towards the back of the vehicle with his hands kind of towards the center console," and officers saw the back-seat passenger shift something in his waistband. During pat searches of the sedan's occupants, law enforcement found suspected controlled substances on the driver and a firearm on the back-seat passenger. Law enforcement also found a firearm under the front passenger seat that Omar had occupied. The firearm was visible, even from outside the sedan. The position of the firearm made it "nearly impossible" for any passenger other than Omar to access the firearm because there was a "cage" underneath the passenger seat that made it "nearly impossible to reach a hand from the back seat to the front." The firearm was also positioned with the grip pointing up towards the front passenger and the barrel pointed towards the back seat.

Proceeding with the second step, we next determine whether the circumstances proved are consistent with Omar's guilt of unlawful possession of a firearm. "Possession . . . may be proved through actual or constructive possession." *State v. Salyers*,

858 N.W.2d 156, 159 (Minn. 2015). The state did not argue that Omar actually possessed the firearm; it argued that he constructively possessed it, which may be proved in either of two ways: (1) "[t]he State may show that the police found the item in a place under the defendant's exclusive control [and] to which other people normally did not have access" or, (2) "if the police found the item in a place to which others had access, the State must show that there is a strong probability (inferable from other evidence) that at the time the defendant was consciously or knowingly exercising dominion and control over it." *Harris*, 895 N.W.2d at 601. "The analysis required [for constructive possession] is necessarily fact driven." *Salyers*, 858 N.W.2d at 159 (quotation omitted).

In his brief to this court, Omar argues that the circumstances proved at trial are inconsistent with his guilt because the firearm was not found in a place within his exclusive control and it was not "rational to infer . . . that Omar was consciously exercising dominion and control over the firearm." The state argues that "considering the circumstances proved in the light most favorable to the verdict, these circumstances are entirely consistent with [Omar's] guilt of constructive possession of the firearm."

When we view the evidence as a whole and in a light favorable to the verdict, we conclude that the circumstances proved show a strong probability that Omar was consciously or knowingly exercising dominion and control over the firearm in the sedan. First, the firearm was under Omar's seat and was visible from outside the sedan. Second, the firearm's position, with the grip facing up towards the front passenger and the barrel pointed towards the back seat, supports the inference that Omar consciously or knowingly exercised dominion and control over the firearm because only Omar had immediate access

8

to it. Testimony established that it would have been "nearly impossible" for someone in the back seat to reach the firearm because a "cage" blocked the back-seat passenger from reaching the firearm. Third, Omar's conduct immediately after the traffic stop supports the inference that he consciously or knowingly exercised dominion and control over the firearm. Testimony established that before he exited the sedan at law enforcement's request, Omar was "kind of leaning his body turned towards" the driver's door "but more towards the back of the vehicle with his hands kind of towards the center console." These movements support the jury's inference that Omar was concealing the weapon.

Fourth, the evidence as a whole supports the inference that all three of the sedan's occupants were engaged in criminal activity, such as possessing weapons or concealing evidence. Omar and the driver wore face masks even though it was over 80 degrees outside; the driver ignored stop lights, was speeding, drove erratically, and refused to pull over when a marked squad car activated its emergency lights.

Finally, we consider whether the circumstances proved are consistent with any rational hypothesis other than guilt. Omar argues that his case is factually similar to *Harris*, in which the Minnesota Supreme Court affirmed this court's decision to reverse Harris's conviction for unlawful possession of a firearm found in a vehicle. 895 N.W.2d at 603. The supreme court concluded that the circumstances proved were consistent with a reasonable alternative hypothesis other than guilt: that Harris "did not know the firearm was in the car." *Id.* Omar argues that the circumstances proved here "are equally consistent with the alternative, rational hypothesis that the owner of the vehicle or a third-party passenger had access to the passenger seat and underneath the seat." He contends that it is reasonable to

9

hypothesize that a third party may have left the firearm in the sedan or that the driver may have placed the firearm under the seat with the handle facing up in case he needed to reach over and grab it.[2]

The circumstances proved in *Harris* included that (1) Harris was driving a car, which he did not own, at night and with passengers in the front and back seats; (2) there was an active warrant for one of the passengers; (3) Harris tried to evade law enforcement as they began a traffic stop; (4) law enforcement noticed "movement in the car"; (5) law enforcement found a firearm tucked into a space near the car's sunroof with the butt of the firearm partially visible; and (6) no conclusive DNA evidence linked the firearm to anyone in the sedan. 895 N.W.2d at 602. The supreme court determined that, "when viewed as a whole, [these circumstances proved] are consistent with a reasonable inference that Harris did not know the firearm was in the car" because "there [was] no evidence that a lay person would have recognized [the visible part of the firearm] as the butt of a firearm, especially in the dark of night." *Id.* at 603.

Omar argues that the circumstances proved in his case are "nearly identical" to those proved in *Harris*. While some similarities exist between the facts here and in *Harris*—such as the number of occupants in the vehicle and a hidden firearm—there are key differences.

---

[2] Omar's brief to this court also argues about reasonable inferences based on the driver's gang affiliation. The state correctly points out that no evidence established the driver's gang affiliation. We decline to consider matters outside the record. *See* Minn. R. Civ. App. P. 110.01 (the record on appeal includes "documents filed in the trial court, the exhibits, and the transcript of the proceedings"); *State v. Anderson*, 733 N.W.2d 128, 139 n.4 (Minn. 2007) (stating that "[i]t is well settled that an appellate court may not base its decision on matters outside the record on appeal" (quotation omitted)).

First, the location and visibility of the two firearms are materially different. In *Harris*, the firearm was hidden "slightly behind the driver's seat" in which Harris was sitting and more fully hidden than the firearm in the sedan—the supreme court stated that "the officer who searched the car did not immediately see the firearm." *Id.* Here, the firearm was under Omar's seat and visible from outside the sedan. Second, the time of day at which the traffic stop occurred is materially different. In *Harris*, the traffic stop occurred when it was dark outside, so the firearm was difficult to see. *Id.* Here, the stop occurred during daylight. Third, the circumstances of the two traffic stops are materially different. Law enforcement saw the driver and Omar wearing ski masks in 80-degree weather as they drove erratically along city streets, the sedan refused to stop when law enforcement activated emergency lights, and Omar and the back-seat passenger made movements after officers approached the sedan. Although Harris's car also evaded a traffic stop and law enforcement noticed some movement in Harris's car, there was no specific movement by Harris near the firearm's location. *Id.* at 597, 603. In contrast, law enforcement saw Omar "kind of leaning his body turned towards" the driver's door "but more towards the back of the vehicle with his hands kind of towards the center console." Given these material differences, we determine that *Harris* is distinguishable.

We also reject both of Omar's suggested alternative hypotheses. Omar first argues that the firearm under his seat belonged to some unknown third-party passenger. But no evidence in the record supports this hypothesis. Because Omar's alternative hypothesis is "untied to the evidence before the jury" and "wholly speculative," it does not warrant reversal. *German*, 929 N.W.2d at 475.

11

Second, Omar argues that the driver possessed the firearm and placed it under the passenger seat. While this theory is consistent with the circumstances proved, it is not inconsistent with Omar's guilt. Importantly, "[a] defendant may possess an item jointly with another person." *Harris*, 895 N.W.2d at 601. At Omar's trial, the district court instructed the jury that "[t]he law . . . recognizes that possession may be either exclusive or joint" and that the jury "may find that the element of possession . . . is present if" the jury found "beyond a reasonable doubt that the defendant had actual or constructive possession of a firearm . . . whether exclusively or jointly." Thus, the jury may have determined that Omar and the driver jointly possessed the firearm, which was visible from outside the sedan and accessible to Omar because it was under his seat.

Given the visibility and accessibility of the firearm to Omar, the circumstances of the traffic stop, and Omar's movements after the officers approached the sedan, the circumstances proved support the strong probability that Omar consciously or knowingly exercised dominion and control over the firearm found under his seat. Even though it is also a reasonable hypothesis consistent with the circumstances proved that the driver possessed the firearm, the alternative hypothesis is not inconsistent with guilt because Omar and the driver may have possessed the firearm jointly. The record evidence is thus sufficient to sustain the jury's verdict that Omar constructively possessed the firearm.

## II.    The record on appeal is insufficient to determine Omar's claim of ineffective assistance of counsel.

Omar argues that he "should be granted a new trial because he was denied his Sixth Amendment right to effective assistance of counsel" when his trial counsel failed to raise

an alternative-perpetrator defense. Before trial, Omar's attorney moved to admit alternative-perpetrator evidence, and the district court granted the motion. In his brief to this court, Omar argues that "defense counsel never raised the affirmative defense of an alternative perpetrator to the jury in the trial proceedings."

"Generally, an ineffective assistance of counsel claim should be raised in a postconviction petition for relief, rather than on direct appeal." *State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000). An appellate court can address an ineffective-assistance-of-counsel claim if there is a sufficient record, meaning there is "no need for additional facts to explain the attorney's decisions." *Black v. State*, 560 N.W.2d 83, 85 n.1 (Minn. 1997).

Here, the record is not sufficient for this court to determine whether Omar's attorney was ineffective. Appellate courts typically defer to an attorney's decisions related to trial strategy, which include determining which defenses to raise. *State v. Vang*, 847 N.W.2d 248, 267 (Minn. 2014). For now, no record establishes whether or why Omar's attorney decided not to raise an alternative-perpetrator defense. Accordingly, we decline to consider this issue and Omar may raise his ineffective-assistance-of-counsel claim in a petition for postconviction relief if he so chooses. *Gustafson*, 610 N.W.2d at 321 (stating that appellant's "right to pursue an ineffective assistance of counsel claim in a petition for postconviction relief is preserved").

**Affirmed.**